Jim P. BENGE, M.D., and Kelsey–
Seybold Medical Group,
PLLC, Appellants.

v.

Lauren WILLIAMS, Appellee.

No. 01–12–00578–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Nov. 18, 2014.

Supplemental Opinions on Denial
of En Banc Reconsideration
Sept. 22, 2015.

686

David George, Earnest W. Wotring, Amy Nilsen, Connelly*Baker*Wotring LLP, Houston, TX, for Appellants.

Randall O. Sorrels, Chelsie King Garza, Abraham, Watkins, Nichols, Sorrels, Agosto & Friend, Lucy H. Forbes, Thé Forbes Firm, PLLC, Houston, TX, for Appellee.

Panel consists of Justices KEYES, BLAND, and BROWN.

## OPINION

HARVEY BROWN, Justice.

Dr. Jim Benge and his employer, Kelsey–Seybold Medical Group, PLLC, appeal from an adverse jury verdict finding that Dr. Benge's medical negligence caused a perforation of Lauren Williams's bowel during a hysterectomy. Dr. Benge and Kelsey–Seybold (collectively Dr. Benge) raise three issues challenging the judgment against them. First, Dr. Benge contends that Williams's expert on the applicable medical standard of care was statutorily disqualified. Second, Dr. Benge argues that the jury charge commingled in one broad-form submission two theories of negligence—negligent surgical technique and negligent failure to obtain the patient's informed consent—over his objection, resulting in harmful error. Third, Dr. Benge asserts that the trial court erred in refusing to allow periodic payment of future medical expenses.

We first consider whether the trial court abused its discretion in allowing Williams's expert on the standard of care to testify; we hold that it did not. We next consider whether the jury charge impermissibly combined valid and invalid theories of liability into a single liability question. Because we conclude that it did and that Dr. Benge preserved the error for appeal, we reverse and remand the cause for a new trial. As a result, we do not reach the issue of periodic payments.

## Background

Williams brought this health care liability case following a hysterectomy. The hysterectomy was performed by Dr. Benge, a board-certified obstetrician and gynecologist who has practiced with Kelsey–Seybold since 2000. Dr. Benge was assisted by Dr. Lauren Giacobbe, a third-year obstetrical/gynecological resident in Methodist Willowbrook Hospital's four-year residency program. It is undisputed that Williams's bowel was perforated as a result of the hysterectomy.

### A. Williams's hysterectomy, complications, and subsequent surgeries

Dr. Benge first saw Williams, then age 39, in June 2008, two months before her surgery. Williams discussed her symptoms, including chronic and "excruciating" pain during her menstrual period. Dr. Benge diagnosed Williams with uterine fibroids, dysfunctional uterine bleeding, and pelvic pain. After consulting with Dr. Benge, Williams elected to undergo a laparoscopic-assisted vaginal hysterectomy (LAVH) to remove her uterus, ovaries, and fallopian tubes.

Dr. Benge next met with Williams one week before the LAVH surgery. Dr. Benge discussed the procedure and presented her with written disclosure and consent forms that they reviewed together. The consent forms—which tracked the requirements imposed by the Texas Legislature—set forth surgical risks associated with the LAVH procedure, including,

among other things, damage to the bowel, the injury that formed the basis for Williams's claim. The consent forms also stated that Dr. Benge could use such "associates, technical assistants and other health care providers as [he] may deem necessary" during the surgery and that those assisting Dr. Benge may include "residents" who could "perform important tasks" during the surgery "under the supervision of a responsible physician." Dr. Benge testified that during this visit he told Williams that he "would be doing the surgery with an assistant." Williams disputes that contention. She testified that he did not tell her there would be an assistant. Although it is disputed whether Dr. Benge mentioned using an assistant in the procedure, the parties agree that Dr. Benge did not tell Williams that he would be assisted by someone with no prior experience assisting on an LAVH procedure.

Williams signed the consent forms and agreed in writing to proceed with the planned LAVH surgery. Dr. Benge performed the LAVH procedure on the morning of August 26, 2008, with Dr. Giacobbe assisting. While Dr. Giacobbe had significant experience with hysterectomies and laparoscopic surgeries, she had not previously assisted an LAVH surgery. Dr. Giacobbe testified that she explained to Dr. Benge her experience level before the surgery began and that he determined the tasks she would perform. She also testified that she introduced herself to Williams on the morning of the surgery and told Williams that she was a resident and was going to be "assisting" Dr. Benge with the surgery. Dr. Giacobbe did not identify the surgical tasks she would perform; she testified that she did not know those details until after the surgery began. Williams disputed Dr. Giacobbe's testimony. She testified that she did not speak with Dr. Giacobbe on the morning of her surgery. Williams further testified that she would not have undergone the surgery

if she had been informed that it was Dr. Giacobbe's first time assisting an LAVH surgery.

The amount of assistance provided by Dr. Giacobbe was disputed. An LAVH operation is divided into two parts: the laparoscopic part, followed by the vaginal part. The post-operative report does not indicate which physician performed which portion of the procedure. Dr. Giacobbe testified that Dr. Benge remained at all times "in control of the patient's care and directing" the surgery. She estimated that she performed approximately 40% of the surgery and did so under Dr. Benge's direction and supervision. In a document she signed after the surgery that was maintained to monitor the resident's experiences, however, she reported that she was "the surgeon," which required her to perform 50% or more of the surgery. Dr. Benge estimated that Dr. Giacobbe performed 40% or less of the surgery. He testified that the standard of care is "for the attending physician to decide, based on [the resident's] skill-set, what is appropriate for her to do."

During the laparoscopic part of the LAVH, Dr. Benge stood on the right side of Williams while Dr. Giacobbe stood on the left. Dr. Benge demonstrated each step of the operation to Dr. Giacobbe and showed her "how to use the instruments and what to do." Dr. Giacobbe would then repeat the same thing on the left side—the side where Williams was determined to have a perforation—while Dr. Benge observed.

Upon completion of the procedure, Dr. Benge examined the surgical area but saw no signs that Williams's bowel had been perforated. He noted no complications in the post-operative report. Within hours of the surgery, Williams began to complain of severe pain, abdominal tenderness, and nausea. Later that day, rectal bleeding

was discovered. By the time Dr. Benge saw Williams on the morning following the LAVH procedure, she had a fever and was anemic, tachycardic, and in constant pain. According to Dr. Benge, nothing about Williams's condition at that time indicated that she had a perforated bowel. He started her on intravenous antibiotics and ordered an x-ray of her chest to ensure that she did not have pneumonia. He did not see her again that day because he went home ill; instead, Dr. Carmen Thornton took over Williams's care.

Williams's post-operative condition continued to deteriorate: her hemoglobin and hematocrit levels fell significantly, she required a multi-unit blood transfusion, and she experienced constant pain. Three days post-surgery, Dr. Thornton ordered a consultation from a gastroenterologist, who performed an emergency exploratory surgery that night and determined that Williams had an undiagnosed bowel perforation that was allowing feces from Williams's intestines to leak into her abdomen. The doctors repaired the perforation, but a colostomy was required.

Afterwards, she was moved to ICU and placed in a chemically-induced coma. Williams subsequently developed sepsis and underwent a tracheotomy. A mechanical ventilator was required. Williams remained comatose at the hospital for three weeks. She was discharged on October 1, 2008, and transferred to Kindred Rehabilitation Hospital. When she left Kindred the next month, she required home health assistance and was unable to work.

Williams had a second surgery in May 2009 in an effort to reverse the colostomy. This procedure could not be completed successfully; therefore, the colostomy was replaced with an ileostomy. Three months later, Williams had her third post-LAVH surgery to replace the ileostomy with another colostomy; the surgery was successful, but the colostomy became permanent. Williams has had two additional surgeries since then to address complications related to the colostomy.

## B. Possible causes of Williams's perforated bowel

One week after Williams's LAVH, Dr. Benge wrote an e-mail to Dr. Giacobbe stating his theory of how the bowel injury occurred. Specifically, he stated that the injury likely resulted from "an electrical arc from the BOVIE,[1] not a sponge stick or the weighted speculum."[2] According to Dr. Benge, during the vaginal portion of the surgery, the weighted speculum was touching the area where the bowel perforated. Dr. Benge opined that an arc of electricity went from the BOVIE through the weighted speculum, causing a "thermal injury" to Williams's bowel tissue below. Even though no immediate damage to the bowel tissue was visible at the time of the surgery, Dr. Benge theorized at trial that an electrical arc from the BOVIE could have caused the inflammation, tissue breakdown, and bowel perforation Williams experienced. While neither Dr. Benge nor Dr. Giacobbe saw an electrical arc during the surgery, Dr. Benge testified that it is possible for an arc to pass from the BOVIE without being seen.

Dr. Bruce Patsner, a board-certified obstetrician/gynecologist, testified as Williams's medical liability expert. In his opinion, the perforation of Williams's bowel occurred during the vaginal portion of the LAVH procedure and was caused by a surgical cut, not a thermal injury resulting

---

1. The "BOVIE" is an electrical cauterizing instrument that uses energy to cut the tissue or to fuse it together to stop bleeding.

2. A weighted speculum is a surgical tool used to hold tissue in an optimal location to allow the surgeon better access to the surgical area.

from an electrical arc as Dr. Benge opined. Dr. Patsner testified that, based on reasonable medical probability, it was more likely that the less-experienced resident made the surgical error, not Dr. Benge.

He opined that the "red flags" presented to Dr. Benge after the hysterectomy suggested operative complications that needed to be addressed. In Dr. Patsner's opinion, Dr. Benge should have suspected a bowel injury and requested an immediate general surgical consultation not later than the day after the surgery. Dr. Patsner opined that, had Dr. Benge done so, Williams "wouldn't have ended up in the operating room with . . . [a] septic shock catastrophe." Based on his opinion that Dr. Benge failed to thoroughly or timely investigate and evaluate the source of Williams's post-LAVH complications, Dr. Patsner concluded that Dr. Benge deviated from the standard of care and proximately caused Williams's injuries.

The jury found in Williams's favor and awarded damages.

### Dr. Patsner Met Statutory Qualifications

In his first issue, Dr. Benge contends that the trial court erred by denying his motion to strike Dr. Patsner as an expert witness. During both the pre-trial and trial phases of this litigation, Dr. Benge challenged Dr. Patsner's qualifications under Chapter 74 of the Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.401–403 (West 2011). Dr. Benge did not assert a substantive challenge to Dr. Patsner's qualifications; rather, he focused on the temporal requirements of the statute. Dr. Benge argued that Dr. Patsner was not "practicing medicine" at the requisite points in time during the litigation, as required by section 74.401(a)(1). TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a)(1) (providing that witness may qualify as expert in health care liabili-

ty suit if witness "is a physician who . . . is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose."). His argument is based on Dr. Patsner's departure from the United States and subsequent work as a law professor and professor of medicine in Korea at the time of his testimony.

### A. Standards of review regarding statutory qualifications

■■■ Each party has the burden to prove that her own expert is qualified to offer expert testimony at trial. *Rittger v. Danos*, 332 S.W.3d 550, 558–59 (Tex.App.-Houston [1st Dist.] 2009, no pet.). The determination of whether a witness is qualified to testify as an expert is left largely to the trial court's discretion. *See Broders v. Heise*, 924 S.W.2d 148, 151 (Tex.1996). We will not disturb the trial court's determination that an expert is qualified unless the trial court abuses its discretion. *See id.* A trial court abuses its discretion when it acts " 'without reference to any guiding rules or principles.' " *Id.* (quoting *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex.1995)); *see Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex.2006). In close cases, we defer to the trial court's resolution of expert qualifications and will not reverse its judgment. *See Larson*, 197 S.W.3d at 304.

■■■ A challenge to an expert's qualifications that raises an issue of statutory construction involves a question of law that we review de novo. *Group v. Vicento*, 164 S.W.3d 724, 730 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). We strive to ascertain and give effect to legislative intent when interpreting statutes. *See id.* We look to the plain and common meaning of the language in the statute, reading the statute as a whole and not in isolation. *Id.* If the meaning is unambiguous, we inter-

pret it according to its terms, giving it a meaning that is consistent with other provisions in the statute. *Id.* Courts read every word as if it was deliberately chosen and presume that omitted words were excluded purposefully. *Id.* We may also consider the legislative objective as well as the consequences of any particular construction. *Id.*

Dr. Benge contends that Williams's expert, Dr. Patsner, does not meet the statutory qualifications to be a medical liability expert witness. We, therefore, review de novo the section 74.401 requirements applicable to expert medical testimony. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.401.

## B. Section 74.401(a) requires that Dr. Patsner was "practicing medicine"

Section 74.401(a) establishes a threefold hurdle that a witness must overcome to qualify as an expert with respect to medical standards of care. TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a). The expert must: (1) be "practicing medicine" at the time the claim arose or at the time the testimony is given; (2) have knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) be qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. *Id.* Dr. Benge challenges the first requirement, arguing that Dr. Patsner was not "practicing medicine" at the specified points in the litigation. Williams concedes that Dr. Patsner was not practicing medicine at the time her claim arose: he was a professor at the

University of Houston Law Center. Williams argues, instead, that Dr. Patsner's work at the time of his testimony meets the statutory requirements for "practicing medicine."

"Practicing medicine" is defined as follows:

> For the purposes of this section, "practicing medicine" or "medical practice" includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(b).

Dr. Benge offers three arguments why Dr. Patsner's work at the time he testified does not meet the statutory requirement that he be "practicing medicine." First, he argues that Williams failed to establish that the Korean school of medicine with which Dr. Patsner was affiliated was "an accredited school of medicine" under section 74.401(b). Second, he argues that Williams offered no evidence that any of the Korean physicians with whom Dr. Patsner was consulting at the time of his testimony meets the statutory definition of a "physician" under section 74.401(g), which requires that the individual be licensed to practice medicine in a state within the United States or have graduated from a medical school with particular accreditations. *See* § 74.401(g).[3] Third, he argues that, to the extent the phrase

---

3. In this subchapter, "physician" means a person who is:

(1) licensed to practice medicine in one or more states in the United States; or

(2) a graduate of a medical school accredited by the Liaison Committee on Medical Education or the American Osteopathic Association only if testifying as a defendant

and that testimony relates to that defendant's standard of care, the alleged departure from that standard of care, or the causal relationship between the alleged departure from that standard of care and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(g) (West 2011).

"practicing medicine" is not limited to the two specifically enumerated definitions listed in section 74.401(b), the phrase nevertheless requires Dr. Patsner to have actually "examined [or] admitted" patients, and Williams offered no evidence that Dr. Patsner was examining or admitting patients in Korea or elsewhere at the relevant time.

We conclude that the statutory definition of "practicing medicine" provides a nonexclusive list of activities that qualify an expert to testify and further conclude that Dr. Patsner's work at the time of his testimony qualifies as "practicing medicine." To assist in explaining our holding, we turn first to Dr. Patsner's medical background.

### 1. Dr. Patsner's medical background

Dr. Patsner's professional background includes private medical practice, teaching positions at medical schools and affiliated hospitals, government service, and teaching positions at law schools. He has worked both in the United States and abroad.

Dr. Patsner is licensed to practice medicine in three states and is board-certified in obstetrics/gynecology with a sub-specialty certification in gynecological oncology. He graduated from Baylor College of Medicine in 1979. He completed his residency in obstetrics and gynecology at the Beth Israel Medical Center at Harvard Medical School. He also completed a fellowship in gynecological oncology in 1985 at the Roswell Park Memorial Institute.

After numerous years teaching at medical schools and working in private practice, Dr. Patsner attended law school. Afterwards, he was a senior medical officer at the Food and Drug Administration in Washington, D.C., for several years and served as the FDA's representative to the Gynecology Practice Committee of the American College of Obstetricians and Gynecologists.

In 2007, Dr. Patsner returned to Houston to teach at the University of Houston Law Center. He also began working as an Associate Professor and Director of Colposcopy and Preinvasive Disease in the Department of Obstetrics and Gynecology at Houston's Baylor College of Medicine. In connection with this position, he received a Temporary Faculty License which permitted him to practice at a limited location even though he did not have a state-wide Texas medical license. He saw patients at Baylor for approximately one and one-half years while also teaching medicine-related law classes at the University of Houston Law Center. At Baylor, he also taught medical students and residents in obstetrics and gynecology and was directly involved in resident teaching conferences to discuss the best methods for performing gynecologic surgery. His affiliation with Baylor ended July 1, 2011.

Though the exact timing is unclear, Dr. Patsner testified that he also was the Assistant Director of Gynecology Oncology Service at Ben Taub Hospital and Harris County Hospital District until he "left Houston" in 2011 for Korea. In this position, he was responsible for teaching medical students and residents in obstetrics/gynecology and fellows in oncology at Ben Taub. He was one of three board-certified gynecological cancer surgeons; he selected and scheduled which of the three would perform various procedures, based on their comparative abilities. He also was one of four attending physicians running gynecological oncology clinics at Ben Taub, where he oversaw Ben Taub's "inpatient pre- and post-operative care of surgical patients on gynecological oncology ... on an every-other-week basis." He ran four clinics a week, seeing patients with preinvasive disease, benign gynecological issues, and gynecological oncology problems.

Dr. Patsner has over 120 peer-reviewed publications. For the majority of those publications, he is the primary author. Additionally, he was on the editorial board for two medical journals and a reviewer for other journals.

In June 2011—six months before the trial of this case—Dr. Patsner ended his academic appointment at Baylor 2011 and began working in Seoul, South Korea, on a three-year contract. He held two positions in Seoul: (1) Adjunct Clinical Professor of Obstetrics and Gynecology at Severance Hospital, Yonsei College of Medicine, and (2) full-time tenure-track Professor of Law and Director of Health Law and Policy at Yonsei Law School, Yonsei University. As an adjunct professor at Yonsei College of Medicine, he trained medical students, residents, and fellows in gynecology and gynecologic oncology and was "heavily involved" in their instruction. Furthermore, he would "directly teach medical students, residents in Obstetrics–Gynecology, and fellows in Gynecologic Oncology and Minimally Invasive Surgery at Yonsei Medical School/Severance University Hospital." He testified that his work at the Yonsei medical school was "the same stuff I've been doing since 1983."

Additionally, while in Korea, Dr. Patsner "regularly lecture[d] on benign gynecology and gynecological oncology topics at University Hospital teaching conferences, and [was] an active participant in the Gynecological Oncology Tumor Board at Yonsei Medical School." Dr. Patsner attended gynecology and gynecological oncology patient-care conferences, during which pre-operative patients were discussed, and was "an active participant" at monthly surgical morbidity and mortality conferences at the medical school. He stated that "[a]t all of these conferences" he and other faculty members would "make patient care recommendations, which include[d] surgical and overall treatment recommendations." According to Dr. Patsner, these discussions focused on the "selection of surgical procedures, route of surgery (open, laparoscopic, vaginal), as well as intense and focused discussions on anticipation of operative complications, proper techniques for recognition of surgical complications, and management of same."

At the time of trial, Dr. Patsner also had an ongoing affiliation with Baylor College of Medicine and the National Institutes of Health. He explained, "[W]e're still doing research. I still have my name on NIH grants at Baylor in their genetics and ovarian cancer laboratory. In fact, I'm meeting with them tomorrow, unless I'm here . . . ."

Though in Korea, Dr. Patsner continued to maintain his medical licenses in several states in the United States, allowing him to be an attending physician, order tests, and write prescriptions. He did not, however, have staff privileges at any hospital at the time he testified; therefore, he could not admit a patient to a hospital.

He characterized his work at the time of trial as follows: "I'm still very active in obstetrics and gynecology even though I also am a law professor" in Korea. "I've worked with residents in clinic and in the operating room my entire career, which I guess now is—it's 32 years." Regarding hysterectomies specifically, Dr. Patsner testified in his deposition—which the trial court had before it—that he had performed and taught LAVH-related techniques "continuously since the early 1990s, and [has] lectured at the medical student, resident, fellow, and attending level on this subject and related subjects (care of the surgical patient, management of complications) since that time as well." He testified that he was the first person in the United States to incorporate the use of a new stapler design in a cervical cancer hysterectomy. In his expert report—

which was also before the trial court—Dr. Patsner estimated that he had directly performed or first-assisted 450 laparoscopic hysterectomies and more than 6,000 abdominal or vaginal hysterectomies during his career.

Dr. Patsner testified at trial that he was leaving in one week to take a surgical team to Honduras for a two-week visit, focused on women's cancer, during which he would be teaching medical students, residents, and surgical fellows; it would be "hands-on." Although Dr. Patsner agreed at trial that he had not performed an LAVH since 1999, he testified that he had worked in operating rooms as recently as two months before trial in Taiwan.

The question, then, is whether Dr. Patsner's work at the time of his testimony was "practicing medicine" within the meaning of section 74.401, such that Dr. Patsner could qualify as a medical expert and opine whether Dr. Benge was negligent in the medical care of Williams. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.401–.403 (concerning qualifications of expert in medical liability case).

### 2. What it means to "practice medicine"

The qualifications required to testify as an expert in a health care liability suit are found in Chapter 74 of the Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.401–.403. Whether an individual is qualified to provide expert testimony is a question of law to the extent that it involves a question of statutory construction. *Vicento,* 164 S.W.3d at 729–30.

Dr. Benge argues that Dr. Patsner's work in Korea does not qualify as "practicing medicine" because he neither examined nor admitted patients to hospitals there. Williams responds that Dr. Patsner's work, viewed in its entirety, meets the general, commonly accepted understanding of the term "practicing medicine" sufficient

to meet the statutory requirement that he be practicing medicine at the time of his testimony. We agree.

### 3. Giving meaning to phrase "includes, but is not limited to"

"Practicing medicine" is statutorily defined. TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(b). It "includes, but is not limited to," training residents and medical students and serving as a consulting physician to other physicians. *Id.* The term "includes" is not defined in Chapter 74; however, the Government Code defines "includes" as a term "of enlargement and not of limitation or exclusive enumeration, and use of [includes] does not create a presumption that components not expressed are excluded." TEX. GOV'T CODE ANN. § 311.005(13) (West 2013); *see Vicento,* 164 S.W.3d at 731 (applying Government Code's definition of "includes" when analyzing section 74.402 of Texas Civil Practice and Remedies Code defining "practicing health care"). Likewise, it has been stated that "[t]he verb *to include* introduces examples, not an exhaustive list." ANTONIN SCALIA & BRYAN GARNER, READING LAW 132 (2012). Thus, a statutory definition that specifies that it "includes but is not limited to" certain activities will be read to allow within it other, non-enumerated activities as well. *Cf. Benavides v. Garcia,* 278 S.W.3d 794, 797 (Tex.App.-San Antonio 2009, pet. denied) (interpreting same provision—section 74.401—and holding that witness who was practicing medicine as *locum tenens* physician—defined as physician who substitutes for another temporarily—qualified as "practicing medicine" and as expert witness). Accordingly, we conclude that section 74.401's use of phrase "includes, but is not limited to" requires that the activities that qualify as "practicing medicine" not be restricted to training at an accredited medical school

and serving as a consultant to physicians as detailed in section 74.401(g).

### 4. Definitions of "practicing" and "medicine"

Dr. Benge argues that, even if the phrase "practicing medicine" includes more than the two examples listed in the statute—i.e., training and consulting—it must be limited to physicians who actively are examining or admitting patients into hospitals. Again we disagree.

■ To ascertain legislative intent, we first look to the plain meaning and common usage of the words chosen by the Legislature. Tex. Gov't Code Ann. § 311.011 (West 2013); *see St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex.1997) ("The Legislature's intent is determined from the plain and common meaning of the words used."). The word "practice" means "to be professionally engaged in" a subject. Merriam-Webster's Collegiate Dictionary 974 (11th ed. 2003). The word "medicine" is defined as "the science and art dealing with the maintenance of health and the prevention, alleviation, or cure of disease." *Id.* at 771. The phrase "practice of medicine" has been given its own definition: "the learned profession that is mastered by graduate training in a medical school and that is devoted to preventing or alleviating or curing diseases and injuries." [4]

■ Accordingly, we conclude that the phrase "practicing medicine" in section 74.401(a)(1) includes a variety of tasks performed by licensed physicians, professionally engaged in preventing, alleviating, and curing diseases and injuries. A physician may be devoted to preventing, alleviating, or curing diseases and injuries through tasks other than "treating" or "admitting" patients. *Cf. Schneider v.*

*Fried*, 320 F.3d 396, 407 (3d Cir.2003) (holding that trial court erred by excluding cardiologist expert who had stopped performing angioplasties but continued to advise interventional cardiologists who performed angioplasties).

■ Further, because the statute uses the phrase "includes, but is not limited to," we conclude that the "practicing medicine" requirement for medical liability experts allows for geographical movement so long as the physician continues to professionally engage in and actively use his medical knowledge as the statute requires. *Cf. Peterson v. Shields*, 652 S.W.2d 929, 930–31 (Tex.1983) (rejecting locality rule); *TTHR, L.P. v. Guyden*, 326 S.W.3d 316, 321 (Tex.App.-Houston [1st Dist.] 2010, no pet.) (stating that the term physician "does not impose any geographical limits"); *accord N.H. Ins. Co. v. Allison*, 414 S.W.3d 266, 274 (Tex.App.-Houston [1st Dist.] 2013, no pet.). Dr. Patsner received his training and board certification in the United States and practiced and taught medicine in Houston the majority of his career. This case does not concern the qualification of a physician who trained, practiced, and taught in another country and then came to Texas to testify.

■ In conclusion, we construe "practicing medicine," within the context of section 74.401, to include a physician who is licensed to practice in the United States, has actively practiced medicine by consulting with other physicians and teaching medical residents in Texas, and then moved to another country where he continues to consult with that country's physicians and teach its medical residents, all the while maintaining his affiliation with a Texas medical school, working on NIH grants, and teaching—with hands-on in-

---

4. "Practice of medicine," http://www.webster-dictionary.org (last visited Oct. 23, 2014); "Practice of medicine," http://www.thefree dictionary.com (same); "Practice of medicine," http://www.definitions.net (same).

volvement—surgical procedures abroad through volunteer service. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.401; *Larson,* 197 S.W.3d at 304–05 (stating that "expert qualifications should not be too narrowly drawn").

## C. Trial court did not err in concluding that Dr. Patsner was practicing medicine

Once we interpret the applicable statute as a matter of law, the issue of whether a particular witness qualifies as an expert under that statute is left to the trial court's discretion. *See Broders,* 924 S.W.2d at 151; *Daniels v. Yancey,* 175 S.W.3d 889, 893 (Tex.App.-Texarkana 2005). We will not find that the trial court abused its discretion in finding Dr. Patsner was qualified unless it acted without reference to any guiding rules or principles. *Daniels,* 175 S.W.3d at 893–94; *Larson,* 197 S.W.3d at 304–05.

The following evidence supports the trial court's ruling:

- Dr. Patsner's substantive (versus temporal) qualifications are unchallenged. Dr. Patsner is a board-certified gynecologist and has maintained his certification at all times relevant to this suit. He has years of experience practicing and teaching in the area of gynecology.
- Dr. Patsner has expertise in the very issue presented in this case; he estimates that he has directly performed or first-assisted 450 laparoscopic hysterectomies and more than 6,000 abdominal or vaginal hysterectomies during his career.
- Dr. Patsner continued to participate "hands-on" in gynecological cancer surgeries up to and after the date of his testimony through international aid work.
- Dr. Patsner's work in Korea, where he had begun working by the time the case went to trial, was substantially similar to the work he performed at Baylor and Ben Taub.
- The time period between Dr. Patsner's last teaching assignment at Baylor and his teaching assignment in Korea was relatively short.
- Dr. Patsner's expertise in gynecology was recognized by Ben Taub, where he was appointed the Assistant Director of Gynecological Oncology and ran four clinics weekly.
- Dr. Patsner performed similar teaching tasks in Korea as he had at Baylor College of Medicine, a research and teaching hospital in Houston. While the record is silent on whether the Yonsei medical school—as opposed to the affiliated teaching hospital—is accredited, his professional work was functionally equivalent to the teaching he had been doing at Baylor several months before his trial testimony.
- Dr. Patsner maintained, through the date of trial, an affiliation with Baylor in Texas: "[W]e're still doing research. I still have my name on NIH grants at Baylor in their genetics and ovarian cancer laboratory."

We conclude that the trial court did not abuse its discretion in admitting Dr. Patsner's testimony. *See Broders,* 924 S.W.2d at 151. We therefore overrule Dr. Benge's first issue.

### *Casteel* Challenge to Broad-form Negligence Question

In his second issue, Dr. Benge argues that the "trial court erred when it mixed valid and invalid legal theories in a broad-form jury question over Defendants' objection." According to Dr. Benge, the broad-form question mixed a valid theory (negligence) with an invalid theory (lack of consent). Dr. Benge contends that the

mixing of these two theories violated *Crown Life Insurance Company v. Casteel*, 22 S.W.3d 378 (Tex.2000).

■ The standard of review for claims of charge error is abuse of discretion. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990); *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 122 (Tex.App.-Houston [1st Dist.] 2011, no pet.). Therefore, we review a trial court's decision to deny a requested instruction under that standard of review. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex.2012). An instruction that might aid the jury in answering the jury questions is proper. *Id.* When a trial court refuses to submit a requested instruction, "the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict." *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex.2006). If the jury charge was erroneous, we must then consider whether the error requires reversal. *Powell*, 356 S.W.3d at 122.

## A. What constitutes a *Casteel* problem

■ *Casteel* and its progeny teach that a jury charge is erroneous when a jury answers a single broad-form liability question affirmatively, the single liability question incorporates multiple legal theories, and at least one of those legal theories does not support liability as a matter of law and therefore is invalid.[5] *Casteel*, 22 S.W.3d at 387–89. The "erroneous commingling of valid and invalid theories of liability in a broad-form liability question" makes it impossible for an appellate court to "determine whether the jury based its verdict on an improperly submitted theory." *Burbage v. Burbage*, 447 S.W.3d 249, 255 (Tex.2014).

■ A theory may be invalid for a variety of reasons, including lack of standing (*Casteel*, 22 S.W.3d at 387–89), lack of supporting evidence (*Romero v. KPH Consolidation, Inc. d/b/a Columbia Kingwood Medical Center*, 166 S.W.3d 212, 225, 227–28 (Tex.2005)), or a failure to plead it (*Texas Commission on Human Rights v. Morrison*, 381 S.W.3d 533, 537 (Tex.2012) (plaintiff did not claim denial of promotion, only wrongful termination and retaliation, and could not do so because she did not pursue that claim before EEOC)). "A trial court errs by submitting to the jury theories of liability that are not legally viable—e.g., liability theories that [1] have not been pled, [2] are not supported by the legally sufficient evidence, or [3] are not supported by operative law." *Powell*, 356 S.W.3d at 123. Thus, the inquiry is not limited to whether an invalid theory was pleaded. If one of the plaintiff's legal theories does not support liability as a matter of law and the plaintiff presented evidence to the jury on that theory that may have led the jury to answer affirmatively the broad-form liability question incorporating the invalid theory, there is a *Casteel*-type charge error. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 863–65 (Tex.2009) (broad-form negligence question included instruction that hospital acts through its employees, agents, nurses, and servants but did not inform jury that hospital is not legally liable for acts of independent contractor-physician and, as result, appellate court could not tell if jury impermissibly found hospital liable for acts of doctor where evidence raised that possibility).

In *Casteel*, the theory was invalid due to an issue of standing. 22 S.W.3d at 387–89. The plaintiff asserted that the defendant

---

**5.** Mixing valid and invalid damages elements also creates a *Casteel* problem. *Harris Cnty. v. Smith*, 96 S.W.3d 230, 234 (Tex.2002).

engaged in a number of unfair or deceptive practices that violated the Insurance Code and DTPA. *Id.* at 381–82. In response to a single broad-form question, the jury found the defendant liable. *Id.* at 387. Because the liability theories were combined in a single question, it was unclear if the jury had assigned liability based on a finding of an Insurance Code violation or DTPA violation. *See id.* The plaintiff could not recover on four DTPA claims because he was not a consumer. *Id.* at 387–88. The Texas Supreme Court held that when a jury question mixes valid and invalid liability theories and it cannot be determined on which theory the jury based its liability finding, appellate courts will presume harm, reverse, and remand the cause for a new trial using a legally correct jury charge. *See id.* at 387–90. To avoid this risk, "when the trial court is unsure whether it should submit a particular theory of liability, separating liability theories best serves the policy of judicial economy underlying Rule 277...." *Id.* at 390; *see also Powell*, 356 S.W.3d at 123 (stating that "judicial economy may favor separate submission of liability theories to prevent the need to re-try the cause of action if the trial court reaches an incorrect decision with regard to which theories of liability should be submitted to the jury.").

In this case, the jury was asked a single liability question, phrased as "negligence." We first consider whether the question effectively presented the theory of informed consent in addition to surgical and post-surgical negligence, taking into consideration Williams's evidence and arguments as well as the overlapping nature of the negligence and informed consent theories. We conclude that, as a result of the combination of these circumstances, the single question here effectively included two distinct liability inquiries.

## B. Williams's theories of liability

Williams argues that the charge does not violate *Casteel* because Dr. Benge's disclosures, or lack thereof, "are simply facts, not theories of liability." While evidence of Dr. Giacobbe's experience was a relevant fact, and not a pleaded theory of liability, the evidence regarding the disclosures went far beyond simply the facts. Evidence regarding the disclosure issue was a major theme of Williams's case and was explicitly incorporated into liability questions asked of her expert, Dr. Patsner.

The jury was asked only one liability question: "Did the negligence, if any, of any of those named below proximately cause Lauren Williams' injuries in question?" Blanks were provided to allow the jury to assign liability to Dr. Benge, Dr. Thornton, and Williams. Negligence, with respect to Dr. Benge, was defined for the jury to mean "failure to use ordinary care that is, failing to do that which an obstetrician/gynecologist of ordinary prudence would have done under the same or similar circumstances or doing that which an obstetrician/gynecologist of ordinary prudence would not have done under the same or similar circumstances."

Throughout trial, Williams presented evidence on and argument about the standard of care, meaning what an obstetrician/gynecologist of ordinary prudence would have done during or after her hysterectomy. Under one of Williams's theories, either Dr. Benge or the resident perforated Williams's bowel, causing feces to enter her abdominal cavity, which ultimately resulted in sepsis, multiple operations, a lengthy coma, and an irreversible colostomy. Williams contended that an ordinarily prudent gynecological surgeon would not have made such an error and, therefore, Dr. Benge was negligent.

She further contended that an ordinarily prudent gynecological surgeon would not

have allowed such an inexperienced resident to perform a large portion of the surgery, as Dr. Benge did. Dr. Giacobbe's level of experience and Dr. Benge's knowledge of that information were both relevant to that claim. Relatedly, and to the extent it was Dr. Giacobbe who erred, the parties do not dispute that Dr. Benge, as Williams's surgeon with a supervising role over the resident, was legally liable for both his own surgical errors and those of the resident he was supervising.

The surgical error claim, in its many iterations—i.e., that Dr. Benge was liable if he (1) negligently perforated Williams's bowel, (2) negligently allowed Dr. Giacobbe to actively participate in the surgery resulting in Dr. Giacobbe perforating the bowel, or (3) reasonably allowed Dr. Giacobbe to operate but then was legally liable when she perforated Williams's bowel—was not the only theory Williams presented to the jury.

Under her unpleaded informed consent theory, Dr. Benge knew an inexperienced resident was going to perform a substantial portion of the surgery under his supervision and he negligently failed to provide that information to Williams before the operation. Williams testified that she had no idea that a resident was going to do a substantial portion of her LAVH or that her surgery would be that resident's first experience performing such a procedure. Further, Williams testified that, had she known that information, she would not have agreed to the operation and, as such, would not have suffered any of her injuries. Williams testified that she was never orally informed that Dr. Benge would be assisted by a resident (as opposed to the written consent forms informing her that he might be assisted by a resident) or that the resident might or would perform a large portion of the surgery. Williams's expert, Dr. Patsner, testified that Dr. Benge's failure to disclose Dr. Giacobbe's

involvement to Williams fell below the standard of care. Under this theory, the question of what a gynecological surgeon of ordinary prudence would do was not addressed to either doctor's surgical techniques but, instead, whether the hired surgeon (Dr. Benge) should have disclosed to the patient that another surgeon with limited experience would perform a substantial portion of the operation. To complete the necessary elements for a finding of negligence under this theory, Williams presented evidence on causation and damages with Williams's testimony that she would not have consented to Dr. Giacobbe's substantial involvement had she known and with Dr. Patsner's testimony that, in his opinion, Williams's substantial injuries were caused by Dr. Giacobbe perforating her bowel. This second theory asserted that Dr. Benge was negligent and caused her injures simply by not telling Williams about Dr. Giacobbe.

Williams insists that the failure-to-disclose theme was a "small piece of evidence" supporting a finding of medical negligence. She correctly observes that jurors do not have to agree on the basis for the negligence and that even if jurors believed Dr. Benge "was wrong not to tell [Williams] about the resident's involvement," they still could have found that Benge used "poor surgical technique." She contends that the poor surgical technique claim was "the focus of the trial." Further, Williams asserts that evidence regarding these non-disclosures was offered to demonstrate that Benge was "deceitful," committed a "betrayal," and "broke a promise." Thus, the evidence, she urges, was presented "for the jury's credibility determination," not as a basis for finding liability. Dr. Benge does not dispute that evidence regarding Dr. Giacobbe's experience was relevant to the claim that Dr. Benge was negligent during the surgery. A reasonable jury could have

determined that the amount of supervision required over an assistant and the tasks delegated to the assistant vary according to the resident's experience. However, he disagrees that the evidence was presented as just a "small piece" of the trial.

A review of the record reveals that Williams went beyond offering admissible facts regarding Dr. Giacobbe's background and Dr. Benge's knowledge of her limitations. Most significantly, Williams's medical liability expert testified that the failure to disclose was a violation of the standard of care:

> Q: Would you say that [Dr. Benge] violated the standard of care if he did not explain that the third-year resident—doing this, her first-time procedure—was going to be performing a part of the surgery?
>
> A: Well, yes.... You can't have ghost surgeons.
>
> Q: Period? End of story?
>
> A: Period.

Dr. Patsner further testified:

> [Y]ou have to get consent from your patients that a resident is going to be do—is going to be with you in the operating room.... And do patients occasionally say no? Yes, they do. I mean, sometimes people don't want to be operated on by people who haven't finished their training. Sometimes they want people with more experience. So the circumstances can vary. The—the standard of care is to get permission from the patient for everybody who's going to be operating on them.

Again Dr. Patsner testified:

> Q: Do you believe that Dr. Benge fell below the standard of care when he allowed someone without the express consent to operate on Lauren Williams?
>
> A: Yes.

Finally, Dr. Patsner testified:

> Q: The area of betrayal, the failure—the failure of Dr. Benge to explain who was doing the surgery on Ms. Williams—was that below the standard of care?
>
> A: Yes. It was outside the standard.
>
> Q: In your opinion, was that a breach of the standard of care? Was that negligent?
>
> A: Yes.[6]

Williams presented a repeated trial theme seeking liability based on the failure-to-disclose theory, which culminated in

---

**6.** That testimony was disputed. Dr. Toy, a board certified physician who served as the residency program director where Dr. Giacobbe was a resident, testified that express permission by the patient for the resident to "perform a surgery" is not required because the resident is in an assistant role, always under the supervision of the attending physician and that the "standard of care does not require disclosure that the resident is putting hands on the patient." Dr. Zepeda, a defense expert witness, also discussed the standard of care. He testified that the standard consent form used by Dr. Benge granted permission for the use of a resident when completing the procedure. Finally, Dr. Benge testified that his practice with regard to disclosing resident participation in surgical procedures was consistent with standard practices and was reasonable. He further testified that his disclosure complied with American Medical Association guidelines for the use of residents during surgery when "the usual form of consent" is used and the named surgeon has "participatory supervision" over the resident's work. The AMA guidelines provide that, when the "usual form of consent to operation" is used, it is permissible for "the operating surgeon to delegate the performance of certain aspects of the operation to the assistant provided this is done under the surgeon's participatory supervision, i.e., the surgeon must scrub." On the other hand, "[i]f a resident or other physician is to perform the operation under non-participatory supervision, it is necessary to make a full disclosure of this fact to the patient."

the final moments of jury argument with her request that the jury "send ... a message" to the medical community that it can no longer rely on a "vaguely worded" disclosure forms to permit active participation by residents in the operating room. Williams asked for a finding of liability for failing to disclose more information about the participation of the resident, whom she described as a "secret surgeon."

This theme was established from the beginning of trial. Williams opened the trial by informing the jury: "We're suing Kelsey–Seybold for six reasons. First reason: betrayal by the Kelsey–Seybold doctor to bring in a surgeon who had no permission, who had no consent to put her hands on Lauren." Williams then told the jury that there were three "steps to betrayal": trust, vulnerability, and betrayal itself, which she described as letting a "secret surgeon, a first-time resident, do a significant part of this procedure."

During closing, Williams explained that she hired "his hands, his experience; but under anesthesia, she got another set of hands working on her ... a set of hands she did not know, who had never done the job before, had no experience. You can't do this in our community." She then sought a jury verdict based on her "betrayal" theory:

> The best thing they can say is "We're good people. We didn't mean it. We're sorry.... The fact that we didn't tell them who was doing the surgery is—it should be of no concern to you because that's the way we want to do business." ... [E]ach one of you—take it upon yourselves to make them change the way they do business.
>
> . . . .
>
> If you want this fiction to continue or to grow throughout the country, find for them. You are the conscience of the community. If that's what you want the standard to be, I'm telling you right now

your job will be very quick. Go back and find for them. That will give them the approval. It'll give them the consent, and it will be publicized throughout the industry, "This is how you do it. Don't tell the patient. It makes things a whole lot easier. We can get a whole lot more training. You just don't tell the patient."

Williams told the jury that it could impact the practice within the medical community concerning "secret" surgeons:

> If you approve that standard today, that will become the standard. You disapprove that standard today, you send them a message, the standard changes. Our community is a safer place to live. That's why I say you are the caretakers of our community. You set the standard. You make it safer for everyone in this courtroom, all of their family, all of their friends, or you can sit silently by and let it continue. Your choice.

Given a one-minute warning at the conclusion of her closing argument, Williams asked the jury "to enforce the safety rules" through its verdict:

> If you choose to do so, if you think these rules are important and need to be enforced, say so by your verdict. You are the conscience of the community. If you don't think they're important, put zero, put zero, because your verdict will be heard. It will be heard by this organization, this group.... They are going to go back doing the same thing they've been doing, not telling people about who's doing the operation.

The disclosure theory was a primary theme of the case.

If the jury, as Williams suggested, agreed that using a "secret surgeon" was not what they "want[ed] the standard to be," and further decided that the ordinarily-prudent-physician standard required disclosure of the resident's role, then this theory could have led the jury to conclude

that Dr. Benge breached his general duty of ordinary care to Williams—completely independent of whether he or Dr. Giacobbe negligently perforated Williams's bowel. And it could have found causation because Williams testified that she would not have undergone the surgery if Dr. Giacobbe's role had been disclosed. This trial theme and the evidence presented to the jury created the possibility of a liability finding based on either of the two negligence theories: negligence during and after the surgery and negligence before the surgery in failing to disclose Dr. Giacobbe's participation or level of experience.

## C. The broad form negligence question effectively included an informed consent issue and therefore violated *Casteel*

Williams responds that the broad-form jury question did not include this second theory; it asked only a general negligence question, thus precluding a *Casteel* error. We therefore next examine whether a reasonable jury could have concluded that the general negligence question subsumed the informed consent issue. Based on the evidence and arguments presented, we conclude that the jury could have, and therefore the broad-form charge violated *Casteel.*

 An informed consent claim is a subspecies of a negligence claim. In such a claim, "the only theory on which recovery may be obtained is that of *negligence* in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent." Tex. Civ. Prac. & Rem. Code Ann. § 74.101 (West 2011) (emphasis added); *see also Schaub v. Sanchez,* 229 S.W.3d 322, 323 (Tex.2007) (stating that a plaintiff "can prevail on her informed consent claim only if she shows that the doctors negligently failed to disclose the procedure's risks or hazards...." [U]nder

[the statute], lack of informed consent is a particular subspecies of negligence based on a failure to disclose the risks or hazards of a procedure."). And whether a physician was negligent in his treatment of a patient is a distinct legal question from whether the physician was negligent in failing to disclose to the patient the risks inherent in the treatment. *Felton v. Lovett,* 388 S.W.3d 656, 663 (Tex.2012). A jury, therefore, should be asked separate questions for the two theories. *See Hawley,* 284 S.W.3d at 863–65.

Medical non-disclosure negligence claims are not the only negligence claims governed by specific principles of duty. For example, premises liability claims and negligent undertaking claims are negligence claims that have defined duty standards. For these claims, a broad-form negligence question is erroneous and cannot support a judgment. *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 837–38 (Tex.2000) (concluding that negligent undertaking claim requires three additional predicate instructions to determine if there is a duty to exercise ordinary care); *Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 529 (Tex.1997) (holding that broad-form negligence question that omitted elements of premises liability claim was insufficient); *see also Torrington,* 46 S.W.3d at 838 ("In premises liability cases, like undertaking cases, a possessor of land may be held liable only if certain conditions are met."); *Custom Transit, L.P. v. Flat-rolled Steel, Inc.,* 375 S.W.3d 337, 362 (Tex. App.-Houston [14th Dist.] 2012, pet. denied) (noting that both premises liability and negligent undertaking claims involve different duties than basic negligence claims and holding that broad-form negligence submission was error for negligent undertaking claim); *Price Drilling Co. v. Zertuche,* 147 S.W.3d 483, 488 (Tex.App.-San Antonio 2004, no pet.) (when plaintiff's claim could "only be characterized as a premises liability claim," submission of or-

dinary negligence questions and instructions resulted in waiver of premises defect claim).

Williams contends that *Casteel* does not govern alternative factual assertions, only different liability theories. We agree, but do not find this distinction applicable in this case. In *Columbia Medical Center of Las Colinas v. Bush ex rel. Bush,* 122 S.W.3d 835 (Tex.App.-Fort Worth 2003, pet. denied), a defendant hospital requested limiting instructions that the jury could not consider specific acts in its evaluation of negligence. *Id.* at 857–58. The trial court refused, and the hospital appealed. *Id.* The appellate court concluded that the case involved alternative factual allegations in support of a single legally grounded theory, not multiple liability theories, one of which was defective. *Id.* at 858–59.

The difference is critical. For example, in *Hawley,* a broad-form negligence question included an instruction that a hospital acts through its employees, agents, nurses and servants. 284 S.W.3d at 863. Yet the charge said nothing about the hospital's undisputed lack of liability for the conduct of a physician who acted as an independent contractor. *Id.* at 862–63. Although the charge's statement that a hospital acts through these four categories of individuals was not improper, the Court held that it was error to refuse an additional requested instruction clarifying this issue because the jury "could have considered" the physician as an agent of the hospital. *Id.* at 863. "The hospital's request was designed to prevent that from happening" by providing a proper limiting definition and instruction that would have assisted the jury. *Id.* at 863–64. Moreover, the plaintiffs did "not complain that the instruction would have 'tilted' the jury against them in some manner;" on the contrary, they asserted that the failure to give the instruction was not error because the issue was undisputed. *Id.* at 864.

Similarly, Dr. Benge submitted an instruction that would have clarified that Williams could not recover on an informed consent negligence theory: "You are instructed that in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery." Dr. Benge's proposed instruction, which the trial court refused, would have properly limited the jury to the issue that Williams states was her only claim: negligent medical treatment during and after the surgery. And like the plaintiff in *Hawley,* Williams did not make any complaint about the substance of the proposed instruction in the trial court or on appeal. The instruction here did not tilt the jury insofar as the physicians' surgical technique and level of experience was at issue. Nor did it prevent the jury from considering Dr. Giacobbe's level of experience and Dr. Benge's knowledge of that information when he permitted Dr. Giacobbe to perform a large portion of the surgery. The proposed instruction would not have prevented the jury from considering that information to determine whether Dr. Benge or Dr. Giacobbe were negligent in their medical treatment of Williams; it only would have limited the jury from considering what Dr. Benge told Williams regarding that information—beyond the signed consent forms [7]—in deciding if he acted

---

7. The consent form states, "I [___] voluntarily request Dr. [___] as my physician and such associates, technical assistants and other health care providers as they may deem necessary, to treat my condition which has been explained to me (us) as [redacted]." It continues, "I (we) understand that the physician may require other physicians including residents to perform important tasks based on their skill set and, in the case of residents, under the supervision of the responsible physician. (Residents are doctors who have fin-

negligently.[8]

Likewise, this case is similar to *Hawley* because although there was only a single jury question, the jury was presented with multiple theories in that one question and that error could have been easily resolved with a simple instruction. The instruction in *Hawley* asking whether the employees, agents, nurses or servants were negligent "effectively submitted four negligence questions." *Hawley*, 284 S.W.3d at 864. Here the single question also "effectively submitted" two different negligence questions.

The Texas Supreme Court in a second case also concluded that a single broad-form question violated *Casteel* even though the accompanying definitions and instructions did not explicitly contain multiple theories because the broad form subsumed within it an improper theory and evidence had been submitted in support of that theory. *Morrison*, 381 S.W.3d at 537. In that wrongful termination lawsuit, the jury was asked whether the defendant took "adverse personnel actions" against the plaintiff because of her opposition to an unlawful discriminatory practice. *Id.* at 536. The plaintiff presented evidence relevant to her wrongful termination claim that she was denied a promotion, but she did not raise such a claim (and could not do so because it was not part of her underlying EEOC complaint). *Id.* at 537. The Court concluded that the charge violated *Casteel*. "Because the jury question allowed liability for 'adverse personnel actions,' the jury could have improperly found liability based upon the denied promotion." *Id.*

Williams repeatedly stressed to the jury that Dr. Benge did not inform her of Dr. Giacobbe's role or experience. Importantly, she also presented expert testimony that the failure to do so violated the standard of care. She disclaims that theory on appeal, stating "this is a surgical neglect case" and "the only question before the jury that's at issue in this appeal was on Benge's surgical negligence," and disclaiming that she "sought [any] recovery" on an informed consent claim. The jury, however, was unaware of this limitation, and the rejected instruction would have made this point clear for it.

The introduction of evidence admissible for multiple purposes does not in itself create a *Casteel* problem. But the broad-form negligence question here necessarily included a non-disclosure legal theory because the evidence explicitly included standard-of-care questions on informed consent. Much like a limiting instruction is appropriate when evidence is admissible for one purpose but inadmissible for another purpose, the requested instruction would have focused the jury properly on the issues of negligence during and after the surgery and away from the theory of non-disclosure. Without the requested instruction, a jury in this situation "could have improperly found liability based upon" the unpleaded informed consent issues. *Morrison*, 381 S.W.3d at 537; *see also Hawley*, 284 S.W.3d at 863 (charge violated *Casteel* because jury "could have considered" physician as agent of hospital).

Finally, Williams asserts that a holding that the trial court abused its discretion in refusing to include the requested instruction is contrary to the preference for

---

ished medical school but are getting more training.)."

8. An alternative instruction would have been that the jury could only consider whether the doctors' acts or omissions during or after the

surgery constituted negligence. That would have prevented a finding of negligence based solely on the failure to disclose to Williams more information about the participating resident.

broad-form submission "whenever feasible." *See* Tex.R. Civ. P. 277; *Thota*, 366 S.W.3d at 688–89. But our system of justice likewise requires the jury to be properly instructed in the law and that broad form is appropriate only when it is feasible. *Casteel*, 22 S.W.3d at 388. We conclude that the broad-form medical negligence question here effectively subsumed an informed consent issue.

We next address whether Williams's second theory—a failure-to-disclose theory—was an invalid theory.

## D. Whether Williams's "secret surgeon" theory of liability was valid as a stand-alone negligence claim

### 1. Duty is a question of law

■ Because an informed consent claim is a subspecies of negligence, it includes the traditional elements of that claim: breach, causation, and damages. But like negligence claims, the threshold issue is whether there is a duty because, if there is no duty, there is no liability. *See Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990); *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987) (superseded by statute on other grounds); *Graff v. Beard*, 858 S.W.2d 918, 919 (Tex.1993).

■ A jury cannot decide whether an individual has a duty; duty is a question of law left to the court's determination. *See Phillips*, 801 S.W.2d at 525; *see also Torrington*, 46 S.W.3d at 837–38. A jury finding that a defendant failed to use reasonable care cannot result in a negligence finding unless the plaintiff first establishes that the defendant had a legal duty to act. *See El Chico Corp.*, 732 S.W.2d at 311. We consider whether the law imposes a legal duty on a physician to disclose information about the level of a resident's participation beyond the standard disclosure form language used in this case that a "resident" may "assist" the surgeon, including performing "important tasks" during the surgery.

### 2. No duty under TMLA

■ "Health care must be based on a patient's informed consent." *Felton*, 388 S.W.3d at 658. The Texas Medical Liability Act, which governs causes of action based on health care liability claims, sets forth the elements of a claim for failure to obtain informed consent. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.101. Under section 74.101, informed-consent claims are "based on the failure of the physician or health care provider to disclose or adequately disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or health care provider." *Id.*

Section 74.102 implements the long-established rule that medical treatment requires a patient's informed consent, *see Binur v. Jacobo*, 135 S.W.3d 646, 654–55 (Tex.2004), by creating a Texas Medical Disclosure Panel "to determine which risks and hazards related to medical care and surgical procedures must be disclosed by health care providers or physicians to their patients or persons authorized to consent for their patients and to establish the general form and substance of such disclosure." Tex. Civ. Prac. & Rem.Code Ann. § 74.102 (West 2011). The Panel evaluates all medical and surgical procedures, determines if disclosure of risks is required, and if so, determines how much disclosure is required. *Bryan v. Watumull*, 230 S.W.3d 503, 508 (Tex.App.-Dallas 2007, pet. denied). The Panel creates two lists reflecting its conclusions, Lists A and B. "If the procedure requires some disclosure of the risks involved in the treatment, it is placed on List A. However, if the Panel determines that no disclosure is required, the procedure is placed on List B." *Id.* at 508–09 (citations omitted).

■ List A identifies the disclosures required for the medical procedures involved in this case: vaginal hysterectomy, fallopian tube and ovarian removal surgery, and abdominal laparoscopic procedures. *See* 25 TEX. ADMIN. CODE §§ 601.2(g)(2), g(3), & (s) (West 2014). It does not require any disclosure of the experience or role of a resident surgeon. When a procedure is included on List A, conformity with its requirements creates a rebuttable presumption that the physician was not negligent. *Bryan,* 230 S.W.3d at 509; TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.104, 74.106(a)(1).

Because the presumption is rebuttable, we will examine whether there is any other source of a duty for Dr. Benge to disclose Dr. Giacobbe's level of participation or experience. *See Felton,* 388 S.W.3d at 660 (stating that if section 74.401 does not apply, the common law does); *Cf.* TEX. CIV. PRAC. & REM.CODE ANN. § 74.106(b) (when procedure is not covered by List A or B, issue is whether there is duty "otherwise imposed by law.").

### 3. No duty under the common law

■ The common law imposes on " '[p]hysicians and surgeons [the] duty to make a reasonable disclosure to a patient.' " *Felton,* 388 S.W.3d at 660 (quoting *Wilson v. Scott,* 412 S.W.2d 299, 301 (Tex.1967)). A reasonable disclosure will include "the risks that would influence a reasonable patient in deciding whether to undergo treatment but not those that would be unduly disturbing to an unreasonable patient." *Id.* at 661. The risks that must be disclosed are those "inherent" in treatment, meaning a risk "that 'exists in and is inseparable from the procedure itself.' " *Id.* (citation omitted). "Inherent risks of treatment are those which are directly related to the treatment and occur without negligence." *Id.* at 662. An informed consent claim concerns "inherent risks" of the procedure—meaning

negative results that can occur as a consequence of a properly performed procedure. It is the possibility of a negative consequence from a properly performed operation that is the operation's inherent risk. *Tajchman v. Giller,* 938 S.W.2d 95, 98–99 (Tex.App.-Dallas 1996, writ denied).

■ By contrast, a physician has no duty to disclose the risks that the surgery "may be based on an erroneous diagnosis or prognosis, or that it is negligently performed." *Felton,* 388 S.W.3d at 662. "Malpractice ... is an extraneous risk, one that inheres in the practice of health care, not in the care itself." *Id.* "[O]nly inherent risks of a procedure—risks that arise from the procedure itself and not from any defect in the procedure or negligent human intervention—need be disclosed." *Tajchman,* 938 S.W.2d at 99. The common law does not, therefore, recognize a duty to disclose such non-inherent risks and failure to disclose them cannot support a liability finding.

Williams's resident-disclosure theory does not concern a risk or hazard inherent to her hysterectomy surgery; this theory concerns the possibility that an inexperienced resident assisting in the surgery might negligently perform the operation and that Dr. Benge might negligently supervise her performance by not catching her error or by allowing her to do more of the surgery or too complex an aspect of the surgery given her limited experience. These are extraneous risks.

No Texas authority has recognized a duty to disclose the level of participation by the resident or that resident's experience level. *See Haynes v. Beceiro,* 219 S.W.3d 24, 27 (Tex.App.-San Antonio 2006, pet. denied) (medical battery case; signature on standard consent and disclosure form permitted active participation in surgery by another doctor because patient consented to her chosen doctor and other

"such associates" he deemed necessary to perform surgery); *cf. Avila v. Flangas,* No. 04–95–00106–CV, 1996 WL 63036, at *2 (Tex.App.-San Antonio Feb. 14, 1996, no writ) (mem. op., not designated for publication) (holding that claim that defendant physicians failed to disclose their inexperience was not inherent risk and therefore did not need to be disclosed; claim concerned negligent human intervention).

While Williams did not sue under a medical battery theory, that cause of action raises issues similar to those underlying Williams's informed consent theory. Medical battery is defined as performing a medical act or treatment on a patient without consent. *See Haynes,* 219 S.W.3d at 26. In *Haynes,* the plaintiff could not prevail on a medical battery claim against an assisting surgeon who participated in her surgery, even though she explicitly informed the surgeon's staff, before her procedure, that "[s]he does not want to see anyone else—or have anyone else do surgery" besides the surgeon she selected. *Id.* at 25. The Disclosure and Consent Form she signed stated that she was "voluntarily request[ing]" her chosen surgeon "and such associates, technical assistants and other health care providers as they may deem necessary to treat my condition ...." *Id.* The court held that consent, therefore, was given for the second surgeon to participate in her procedure. *Id.*; *cf. Lane v. Anderson,* 345 Ill.App.3d 256, 280 Ill.Dec. 757, 802 N.E.2d 1278, 1282–84 (2004) (holding, in medical battery case addressing level of participation by resident, that plaintiff does not have medical battery claim, as matter of law, against resident who "performed a majority of the surgery" because, by signing consent form, plaintiff consented to selected surgeon and his assisting resident, "regardless of the

degree to which [the resident] participated").

**4. Conclusion on duty**

The Legislature has created a comprehensive statutory scheme concerning disclosure and informed consent law, and it is the Legislature's prerogative to expand the level of disclosure required, should it see fit. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.101–.107. Mindful of the statutory framework and following the analysis in *Haynes,* we conclude that Texas law does not impose a legal duty to disclose to a patient specific information about a consented-to assisting surgeon's anticipated level of participation or experience. We further conclude that an assertion of medical negligence that characterizes the failure to disclose this information as a breach of duty presents an invalid legal theory.

We address next whether Dr. Benge preserved error on his *Casteel* challenge.

**E. Whether Dr. Benge preserved *Casteel* error**

Any complaint to a jury charge, including "complaints of error in broad-form submission," is waived unless a party "make[s] the trial court aware of the complaint, timely and plainly, and obtain[s] a ruling." *In re B.L.D.,* 113 S.W.3d 340, 349 (Tex.2003). Objections must both "clearly designate the error" and "explain the grounds for complaint." *Burbage,* 447 S.W.3d at 256. An objection must "explain the nature of the error" so the trial court may correct it. *Id.* at 258.

Williams contends that Dr. Benge waived any error in the jury charge by failing to object during trial to questions asked of him on cross-examination about his non-disclosure of Dr. Giacobbe's level of experience and surgical participation.[9]

9. Williams does not contend that the charge objection did not advise the trial court of the

*Casteel* problem or that the proposed instruction was incorrect or confusing.

However, the issue Dr. Benge raises on appeal is a legal one related to jury-charge error, not an evidentiary issue. Mid-trial evidentiary objections were not necessary to preserve this complaint. *See Felton,* 388 S.W.3d at 660 & n. 9 (noting that purely legal issues, which do not affect jury's role as fact-finder, will preserve error even if raised for first time in post-verdict motions). Moreover, Dr. Benge asserted during the presentation of the evidence that Williams was improperly injecting a consent theory into the case.

After the parties rested, the court held an informal charge conference. During the informal conference, Dr. Benge asked for the following instruction:

> You are instructed that in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery.

Williams responded, "It's not an informed-consent case. It's whether or not Dr. Benge acted properly when he didn't do part of the surgery and let someone else do it. That's what the case is about ... It's not an informed-consent case. It's a negligence case." In reply, Dr. Benge asserted that Williams therefore should have no objection to the instruction. When the court asked why the instruction was necessary, Dr. Benge responded that evidence had been presented on the consent issue. He further stated, "But the problem is the jury very well could focus on [informed consent] and could decide, 'Boy, I wish they would have given Ms. Williams more information. She might not have allowed Dr. Giacobbe to be involved.' That is informed consent, which isn't in the case." The trial judge stated that she would not give the instruction.

During the formal charge conference, Dr. Benge objected to the broad-form liability question as follows: "[D]efendants object to Question Number 1, negligence, because the broad-form submission allows the jury to base its finding on a violation of informed consent...." The objection was overruled. In an effort to reduce the possibility that the jury would assign liability for failing to disclose the resident's involvement, Dr. Benge requested the same instruction that he had requested during the informal charge conference. The requested instruction was refused.

Dr. Benge specifically objected to the broad-form nature of the liability question and advised the trial court that a liability finding could be based on the informed consent theory that Williams presented. Subsequently, Dr. Benge offered an instruction that would have prevented the jury from finding negligence based on a failure to inform. While he did not cite *Casteel,* it was unnecessary for him to do so. *Morrison,* 381 S.W.3d at 536 ("*Casteel* error may be preserved without specifically mentioning *Casteel.*"); *Thota,* 366 S.W.3d at 691 ("[Appellant] did not have to cite or reference *Casteel* specifically to preserve the right for the appellate court to apply the presumed harm analysis...."). His objection informed the trial court that the broad-form negligence question mixed general negligence and informed consent issues. His proposed instruction attempted to carve out the informed consent issue from the broad-form negligence question. Dr. Benge, therefore, apprised the trial court of the error "such that the court [had] the opportunity to correct the problem." *Burbage,* 447 S.W.3d at 257; *see also Thota,* 366 S.W.3d at 690–91 (holding the charge error was sufficiently preserved). And the instruction did so while allowing the jury to consider the evidence of Dr. Giacobbe's inexperience: it only precluded a negligence finding based on what Williams was told about that experience. Thus, the jury could have relied on her experience not

only in evaluating her conduct during the surgery, but also Dr. Benge's supervision of her during the surgery. In short, Dr. Benge's proposed instruction did not detract the jury from focusing on the claimed acts of negligence during and after the surgery.

We conclude that Dr. Benge's complaints were sufficient to alert the trial court to the potential deficiency in the jury charge that set up a *Casteel* problem, merging valid and invalid theories of liability into a single, broad-form liability question. *See Morrison*, 381 S.W.3d at 536 (holding in wrongful termination lawsuit that complaint that charge improperly lumped different employment actions together was sufficiently identified to preserve error even though employer did not state during charge conference that question mixed legally valid and invalid theories or, as phrased by intermediate appellate court, in *Texas Commission on Human Rights v. Morrison*, 346 S.W.3d 838, 847–48 (Tex.App.-Austin 2011), *rev'd*, 381 S.W.3d 533 (Tex.2012), "that it was concerned about legally invalid theories"). As the Texas Supreme Court has explained,

> There should be but one test for determining if a party has preserved error in the jury charge, and that is *whether the party made the trial court aware of the complaint,* timely and plainly, and obtained a ruling. The more specific requirements of the rules should be applied . . . to serve rather than defeat this principle.

*State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex.1992) (emphasis added); *see also Thota*, 366 S.W.3d at 690. We conclude that Dr. Benge preserved error in the jury charge.

Having concluded that Dr. Benge preserved error, we turn next to whether the commingling of the valid and invalid theories was harmful error.

### F. *Casteel* error requires reversal

Williams contends that there was sufficient evidence for the jury to find that Dr. Benge or Dr. Giacobbe operated below the standard of care when one or the other perforated Williams's bowel during surgery. Thus, she concludes, any error is harmless.

When an invalid legal theory is mixed with one or more valid theories at trial and the jury is given only a broad-form liability question to which a proper objection is made, an appellate court will presume error because it cannot be determined if liability was based on a valid theory or solely on one of the invalid theories. *See Casteel*, 22 S.W.3d at 378–79; Tex.R.App. P. 44.1(a)(2). The appellant is left unable to demonstrate the consequence of the trial court's jury charge error because it is unclear on what the jury based its decision. *Casteel*, 22 S.W.3d at 388.

Similar to the argument presented by Williams, the plaintiffs in *Hawley* argued that any jury charge error (which resulted because the jury could have reasonably—but erroneously—interpreted the charge to allow vicarious liability on the hospital for a physician who was not its agent) was harmless because the jury could have found negligence based on the nurses' acts or omissions. 284 S.W.3d at 864. But the Court held that the error was harmful, nevertheless, because it was impossible to determine whether the jury held the defendant hospital negligent based solely on the conduct of the physician or based on the conduct of the other individuals for whom the hospital had vicarious liability. *Id.* at 864–65. Thus, the Texas Supreme Court could not tell whether the jury thought the hospital was liable under a valid theory (negligence based on negligent acts by its nurses) or an invalid theory (negligence based on the negligent acts

of the independent contractor physician). *Id.* At all times, the only "liability theory" was negligence; however, one of the two bases for a liability finding had no support under Texas law. *See id.* The Court presumed that the jury charge caused harm. *Id.* at 865.

Similarly, the mixing of an invalid theory with a valid theory was harmful and required reversal in *Romero.* 166 S.W.3d at 227–28. There, the plaintiff sued a hospital for malicious credentialing of a surgeon who was a known drug abuser. *Id.* at 217–19. The plaintiff also claimed the hospital was negligent in delaying a blood transfusion during surgery. *Id.* The charge included a single, broad-form, apportionment-of-liability question. *Id.* at 215. The jury found the hospital liable under both theories and assigned it a percentage of responsibility. *Id.* at 214–15. The Texas Supreme Court concluded, however, that there was no evidence of malicious credentialing. *Id.* at 224. It further found that the broad-form apportionment question made it impossible to determine how much of the hospital's assigned responsibility was due to the impermissible malicious credentialing theory versus the allowed negligent delivery-of-blood theory. *Id.* at 226. Citing *Casteel,* the Supreme Court explained, "Even if the jury *could* still have made the same apportionment of fault, the error in the question is nevertheless reversible because it effectively prevents Columbia from complaining on appeal that they *would not* have done so." *Id.* The plaintiff could not avoid reversal by arguing that the jury might have reached the same apportionment of responsibility. *Id.*

Likewise, the Court in *Morrison* rejected the plaintiff's argument that, when an invalid theory is not directly submitted to the jury but is merely subsumed within broad language, "the mere possibility the jury may find liability based on an invalid theory does not constitute harm." *Morrison,* 381 S.W.3d at 537. The Court explained: "The harm to [the Appellant] is not that the jury reached the wrong verdict, but rather that [the Appellant] has been prohibited from demonstrating on appeal that the jury's verdict was based upon the invalid legal theory." *Id.*

Here, Williams argued two alternative legal bases for finding Dr. Benge negligent: (1) either Dr. Benge or the resident physician for whom he was responsible were negligent during or after the surgery or, alternatively, (2) Dr. Benge failed to disclose Dr. Giacobbe's role or experience beyond the statements contained in the signed disclosure forms and such failure was below the standard of care and, therefore, negligent. The first is a valid theory of liability, but the second is not. Williams repeatedly urged the jury to answer the liability question affirmatively on the basis of this invalid legal theory.

From this record, we cannot say that the jury was not significantly influenced by the disclosure issue. We therefore sustain Dr. Benge's second issue and must reverse.

## Conclusion

Having sustained Dr. Benge's second issue, we reverse and remand the case for a new trial. In doing so, we do not reach Dr. Benge's third issue challenging the denial of periodic payments.

All pending motions are denied as moot.

Justice KEYES, dissenting.

EVELYN V. KEYES, Justice, dissenting.

I respectfully dissent. This is a simple medical negligence case in which a patient recovered damages for physical pain and suffering, mental anguish, and lost earnings against her gynecological surgeon for

professional negligence in performing her laparoscopic-assisted vaginal hysterectomy ("LAVH"). Yet the majority takes an element of the proof of professional negligence—the defendant-surgeon's failure to tell the patient that he was turning over half of her surgery to an unqualified co-surgeon he was supervising—and turns this fact into an unpled and invalid theory of recovery, not submitted to the jury, but on which the majority presumes damages to have been awarded anyway.

The majority concludes that the unpled theory of recovery arose from the Texas Supreme Court's decision in *Felton v. Lovett*,[1] which defines the scope of a physician's duty to disclose the risks of medical procedures under the Medical Liability Act ("MLA"), and it reforms the plaintiff's general negligence case to include it. It further concludes that this theory of recovery is entirely separate from professional negligence, that evidence of failure to disclose the use of an unqualified co-surgeon is not evidence of professional negligence, and that this evidence cannot be used to show that a physician committed professional negligence. Finally, it determines that the trial court's *failure* to submit this invalid theory of recovery to the jury, and its failure to instruct the jury to disregard the evidence of what the defendant physician told the patient, is reversible error because it allowed the jury to award damages based solely or primarily on the invalid theory of recovery of damages in violation of *Crown Life Insurance Co v. Casteel*.[2] Therefore, it orders that the case be remanded to be retried *without the invalid theory that was neither pled nor submitted* to the jury. It also orders that the case be retried (1) without evidence that the defen-

dant surgeon failed to tell his patient that he would be turning over the surgery on one side of her body to an unqualified resident physician he was supervising who had never done an LAVH and (2) without expert testimony that failure to disclose the use of an unqualified co-surgeon is a breach of a surgeon's standard of care.

In my view, the majority finds jury charge error where there was none; finds that the alleged error was preserved when it was not; mistakenly confuses *evidence* of medical negligence with a *separate cause of action*; misapprehends and misconstrues the plaintiff's case; misapplies the Texas Supreme Court's holding in *Felton*, creating and injecting into the case a new theory of liability which it acknowledges is both invalid and unpled; greatly expands the concept of jury charge error requiring reversal of a judgment for an invalid element of damages under *Casteel*; and, ultimately, denies the plaintiff her right to submit material evidence going to proof of her claim that the defendant-physician breached the professional standard of care of a gynecological surgeon performing her operation. Because I believe the majority opinion lays the groundwork for dangerous judicial overreach in overturning properly decided cases, I must dissent.

### The Parties' Arguments

Appellee Lauren Williams sued appellants Jim P. Benge, M.D., and Kelsey–Seybold Medical Group, PLLC, for medical malpractice, alleging breach of the standard of professional care of a physician performing an LAVH. Williams argued that Dr. Benge committed profes-

---

1. 388 S.W.3d 656 (Tex.2012).

2. 22 S.W.3d 378, 389 (Tex.2000) (holding that when single broad-form liability question erroneously commingles valid and invalid liabil-

ity theories and appellant's objection is timely and specific, error is harmful when appellate court cannot determine whether improperly submitted theories formed sole basis for jury's finding).

sional negligence in performing her LAVH by turning over half the surgery to a resident physician, Dr. Giacobbe, who had never done an LAVH operation, greatly increasing the risk of the operation, without telling Williams that his co-surgeon was inexperienced and unqualified, with the foreseeable result that the resident pierced Williams' bowel, causing severe life-long injuries.

During the trial, Dr. Benge's counsel insisted that Williams was *really* arguing not only that Dr. Benge had breached the standard of care of a physician performing LAVH surgery—which she had pled—but also that he had breached a non-existent statutory duty of a physician to disclose that he was using an assistant—a liability theory Williams had *not* pled and with which she did not agree. Instead, Williams argued and produced evidence that Dr. Benge had used Dr. Giacobbe not as an assistant but as a co-surgeon, that he did not tell Williams he was using Dr. Giacobbe, and that his actions violated the professional standard of care. Thus, in my view, Williams created questions for the jury as to whether Dr. Benge used Dr. Giacobbe as an undisclosed and unqualified co-surgeon and whether, if he did, his use of Dr. Giacobbe as co-surgeon and his failure to disclose to Williams his intended use of an unqualified co-surgeon were acts of professional negligence.

Nevertheless, at the charge conference, Dr. Benge objected to the jury charge on the ground that the single broad-form jury question on professional negligence submitted to the jury allowed it to find liability based on breach of the statutory duty to disclose and obtain the patient's informed consent and that "that theory was unsupported by the pleadings or the evidence." The trial court overruled the objection. Dr. Benge also requested, in writing, an instruction to the jury that they were not to consider "what the defendant told, or

did not tell, the plaintiff about the resident physician's being involved with the surgery." The court refused the instruction.

The case was submitted to the jury on a single broad-form negligence question of liability. The jury found that Dr. Benge was negligent and awarded Williams damages for mental pain and anguish, lost earning capacity, physical impairment, and medical expenses.

On appeal, Dr. Benge argues that the jury's award of damages to Williams for his medical negligence was based, solely or primarily, on the invalid theory that he had a statutory duty to disclose the use of a resident assistant, which he did not have. And he argues that the trial court's error in allowing the jury to consider evidence relating to this invalid theory of recovery as evidence of his medical negligence so contaminated the jury's damage award that the case must be reversed and retried.

The majority accepts all of Dr. Benge's arguments and reverses and remands the case. I do not accept them. I find them to be internally self-contradictory and also contradictory to the pleadings, the record, the charge, and the law. I do not agree with Dr. Benge that he has successfully injected an invalid theory of recovery into the case, preserved error as to its omission from the charge, succeeded in having the theory considered by the jury despite its omission from the charge, and is entitled to a new trial without the omitted theory— and without the evidence of malpractice it actually constitutes—because it was invalid and should not have been considered by the jury.

I find no error in the charge and ample evidence to support the jury's verdict holding Dr. Benge liable to Williams for malpractice and awarding her damages for his breach of the duty of care of an ordinarily prudent physician performing an LAVH

operation. I agree with the majority that Williams' expert, Dr. Patsner, was eminently qualified to testify and that the trial court did not err in admitting his testimony on the standard of care of a physician performing a hysterectomy. Therefore, I would affirm the judgment of the trial court.

## Background

### A. The Trial

This is a case in which a patient, Williams, went to the hospital because of painful menstrual problems to have an elective LAVH performed by a surgeon she trusted and had used before, Dr. Benge, and left the operating table with severe, lifelong medical injuries. Dr. Benge's own expert testified that he had "not personally" ever seen a patient have an outcome as bad as Williams' from an LAVH. Williams' expert, Dr. Patsner, testified, "She is actually the worst outcome I've ever seen after this operation in 30 years of taking care of patients with this, short of—short of dying."

The undisputed evidence shows that Dr. Benge allowed a resident physician, Dr. Giacobbe, to perform all of the surgery on the left side of Williams' body, even though he knew that she had never performed surgery of this type before. Both Dr. Benge and Dr. Giacobbe testified that Dr. Giacobbe performed 40% of the surgery, but the medical form signed by Dr. Giacobbe after the procedure stated that she was the "surgeon," which meant that she performed 50% or more. There was conflicting evidence as to whether Dr. Benge told Williams that he would be using a medical resident to "assist" him—a disclosure Dr. Benge and Dr. Giacobbe testified they made and Williams denies they made. However, the evidence is undisputed that Dr. Benge did not tell Williams that he would be turning over all the surgery on one side of Williams' body to Dr. Giacobbe.

Rather, Dr. Giacobbe testified that Dr. Benge did not even tell *her* what part of the surgery she would be performing until after the surgery began. And the evidence is undisputed that neither Dr. Benge nor Dr. Giacobbe told Williams that this would be Dr. Giacobbe's first LAVH procedure. The operation left Williams with a life-threatening perforated bowel on the left side of her body—the side on which Dr. Giacobbe had performed the operation.

Immediately following the LAVH, Williams developed severe pain, abdominal tenderness, nausea, and a fever due to a perforated bowel. Dr. Benge checked her the next day, but failed to diagnose the perforated bowel. Instead, he went home sick and turned over Williams' care to Dr. Carmen Thornton. Three days after the surgery, Dr. Thornton ordered a consultation with a gastroenterologist. The gastroenterologist performed emergency exploratory surgery that same night and determined that Williams had an undiagnosed bowel perforation that was allowing feces from her intestines to leak into her abdomen. A colostomy was required and performed. Williams developed sepsis, underwent a tracheotomy, and was placed in a medically induced coma. She suffered months of rehabilitation, including having to learn to breathe, walk, and talk again.

Williams was left with her vagina, bladder, and rectum fused together, and they had to be separated when doctors attempted to reverse the colostomy. However, the colostomy could not be reversed because there was not enough of Williams' rectum and intestines left to stretch for the repair. Multiple surgeries followed, but the colostomy remained permanent, requiring the use of a colostomy bag. Williams is unable to have normal sexual relations, and she has ongoing depression,

anxiety, and post-traumatic stress disorder, as well as physical symptoms.

Dr. Zepeda, Dr. Benge's own medical liability expert, agreed that all of Williams' injuries were a direct result of the LAVH performed by Dr. Benge. Dr. Patsner, Williams' expert, likewise testified that all of Williams' surgeries and complications were a result of the LAVH.

There was conflicting evidence at trial from which the jury could have concluded either that Williams' bowel perforation was caused by an electrical arc from a medical instrument, a Bovie, used during the LAVH, as Dr. Benge theorized, or from a slit in Williams' bowel on the side on which the resident, Dr. Giacobbe, performed the operation, as Williams' expert testified. Either way, both Dr. Benge and his expert, Dr. Zepeda, agreed that Dr. Benge was responsible for any acts of negligence committed by Dr. Giacobbe. Dr. Zepeda agreed "absolutely" with the proposition that doctors are always responsible for the acts of the residents they supervise.

With respect to Dr. Benge's failure to disclose to Williams that he intended to use Dr. Giacobbe as a co-surgeon, the record reflects the following exchange between Dr. Benge's counsel and Williams's expert, Dr. Patsner:

Q: Well, let's talk a little bit about some of the claims we've made in this case.... Would you say that [Dr. Benge] violated the standard of care if he did not explain that the third-year resident—doing this, her first-time procedure—was going to be performing a part of the surgery?

A: Well, yes. There's a—I mean, there's a difference between being just an assistant and being a co-surgeon.

. . .

So in this particular instance there were two surgeons.

. . .

The—the standard of care is to get permission from the patient for everybody who's going to be operating on them. You can't have ghost surgeons.

Q: Period? End of story?

A: Period.

### B. The Jury Charge

At the charge conference, Dr. Benge objected to submission of Williams' case to the jury on a single broad-form negligence question as to liability, objecting to "Question No. 1, negligence, because the broad-form submission allows the jury to base its finding on a violation of informed consent and that that theory is not supported by the pleadings or the evidence." The trial court overruled the objection.

Dr. Benge did not seek a legal ruling on his argument that his alleged failure to disclose his intended use of either "an assistant" or an unqualified co-surgeon constituted an invalid separate and independent theory of liability for Williams' injuries that should be separately submitted to the jury as the proximate cause of some or all of her damages.

Dr. Benge did request, in writing, an instruction to the jury that "in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery." He did not state any reason for requesting this instruction, and the trial court refused it.

The case was presented to the jury on a single-broad form negligence question as to liability: "Did the negligence, if any, of any of those named below proximately cause Lauren Williams' injuries in question?" Those named were Dr. Benge, Dr. Thornton, and Williams. An instruction defined negligence with respect to the physicians as "failure to use ordinary care that

is, failing to do that which an obstetrician/gynecologist of ordinary prudence would have done under the same or similar circumstances or doing that which an obstetrician/gynecologist of ordinary prudence would not have done under the same or similar circumstances."

The jury found that Dr. Benge was negligent and that Dr. Thornton and Williams were not. It awarded Williams $240,000 in damages for past and future pain and mental anguish; $302,609 for past and future lost earning capacity, zero damages for disfigurement, $20,000 for past and future physical impairment, and $1,332,960.14 for past and future medical expenses. It was not asked to find, and did not find, any separate damages for breach of a duty to disclose.

## Analysis

Dr. Benge argues and the majority concludes that (1) Dr. Benge preserved his complaint by his objection to broad-form submission of Williams' negligence claim on the ground that the question "allows the jury to base its finding on a violation of informed consent and . . . that theory is not supported by the pleadings or the evidence"; (2) as a matter of law, a physician has no duty to disclose to a patient that he intends to turn over laparoscopic-assisted surgery on half of a patient's body to a co-surgeon who has never performed the operation; (3) the failure to make such a disclosure is a separate theory of liability that cannot, as a matter of law, constitute an act of professional negligence; (4) it was harmful error for the trial court to refuse to include this separate theory of liability in the charge and, likewise, to refuse to include an instruction to the jury to disregard all evidence relating to the theory of failure to disclose; (5) under the Texas Supreme Court's ruling in *Felton,* a physician has no statutory duty to disclose the intended use of an unqualified co-surgeon to perform half of a patient's laparo-

scopic-assisted surgery, so that this unpled theory of liability is invalid; (6) the trial court erred in failing to submit this unpled and invalid theory of liability to the jury as a separate question while allowing it to consider evidence of the physician's use of an unqualified and inexperienced resident as an undisclosed co-surgeon as professional negligence; and (7) this error caused the jury to award damages based on the unsubmitted, unpled, and invalid theory of liability and was so harmful that (8) the appellate court is required by *Casteel* to reverse the judgment of the trial court and remand the case for retrial— without submission of the invalid, unpled, unsubmitted theory, *and* without evidence relating to it. I disagree with each of these arguments and conclusions and believe that they are contrary to established legal authority.

### A. Preservation of Error

Dr. Benge made the following objection to the jury charge: "Question No. 1, negligence, because the broad-form submission allows the jury to base its finding on a violation of informed consent and that that theory is not supported by the pleadings or the evidence." I would hold that this objection did not preserve Dr. Benge's complaint.

Texas Rule of Civil Procedure 274, governing preservation of alleged error in the jury charge, requires that an objecting party "must point out distinctly the objectionable matter and the grounds of the objection," stating that "[a]ny complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." Tex.R. Civ. P. 274. Likewise, Texas Rule of Appellate Procedure 33.1 requires a complaining party (1) to make a timely objection to the trial court that "state[s] the grounds for the ruling that the complaining party

[seeks] from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context" and (2) to obtain a ruling on his objection. *See* Tex. R.App. P. 33.1(a); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex.1992). Under the preservation rules as articulated by the Texas Supreme Court, "A timely objection, plainly informing the court that a specific element ... should not be included in a broad-form question because there *is no evidence to support its submission*, ... preserves the error for appellate review." *Thota v. Young*, 366 S.W.3d 678, 691 (Tex.2012) (emphasis in original) (quoting *Harris Cnty. v. Smith*, 96 S.W.3d 230, 236 (Tex. 2002)).

Here, Dr. Benge did just the opposite of what the preservation rules require. His sole argument regarding his objection to the charge was that the jury *might* have considered his "violation of informed consent" *as an element of malpractice*, implying that it was not an element of malpractice, and not proof of malpractice, but a separate theory of liability. He then asked that the jury be instructed to disregard all evidence of anything he had said to Williams about Dr. Giacobbe's qualifications. He did *not* object that the broad-form negligence question on which the case was submitted to the jury contained a specific element as to which there was *no evidence*. He objected that the single broad-form liability question on negligence permitted the jury to consider *evidence* in the record of what he argued was an *unpled theory* of breach of the duty to disclose that was "*not supported by the pleadings or the evidence*." At the same time, he, inconsistently, requested an instruction that the jury could not consider the *evidence* of "what [Dr. Benge] told, or did not tell, [Williams] about the resident physician being involved with the surgery" that *was* present in the record. An objection to

a broad-form question that it includes a theory as to which there *is* evidence a party does not want the jury to consider does not preserve error. *See Thota*, 366 S.W.3d at 691. Moreover, Dr. Benge did not satisfy Rule 274, requiring that an objecting party "must point out distinctly the objectionable matter and the grounds of the objection." *See* Tex.R. Civ. P. 274; *Thota*, 366 S.W.3d at 690–91. I would hold that the objection Dr. Benge made to the charge was insufficient to preserve his complaint on this point because it contradicted Rule 274 and *Thota*.

I would also hold that Dr. Benge's objection was insufficient to preserve error because the link between the objection and the argument on appeal that the charge violated *Casteel* was not specifically stated and because the objection and argument on appeal are inconsistent both with each other and with *Casteel*. *Casteel* holds that the trial court's submission of the case to the jury on a single broad-form negligence question is harmful error requiring reversal when it permits the jury to find damages on an invalid theory that was *pled* along with a valid one. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 387–88 (Tex.2000); *see also Payne*, 838 S.W.2d at 241 (stating that test for determining preservation of error in charge is "whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling"). Dr. Benge argues, and the majority agrees, that the theory he claimed Williams had *not* pled was not supported by the professional negligence pleadings or the evidence. I do not see how this objection can satisfy Rule 33.1's and *Payne*'s requirement that an objection "state[ ] the grounds for the ruling that the complaining party [seeks] from the trial court with sufficient specificity to make the trial court aware of the complaint." Tex. R.App. P. 33.1(a)(1)(A); *Payne*, 838 S.W.2d at 241.

But even if I could agree that Dr. Benge preserved his complaint, I could not agree, that the trial court erred or that the objection on which this appeal is based is valid.

### B. Charge Error

Texas Rule of Civil Procedure 277 mandates broad-form submission "whenever feasible." Tex.R. Civ. P. 277; *see also Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990) (interpreting "whenever feasible" as mandating broad-form submission "in any or every instance in which it is capable of being accomplished"); Comm. on Pattern Jury Charges, State Bar of Tex., *Tex. Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 4.1 cmt. (2012). Rule 278 provides that the trial court must "submit the questions, instructions and definitions in the form provided by Rule 277, which are *raised by the written pleadings and the evidence.*" Tex.R. Civ. P. 278 (emphasis added); *Smith*, 96 S.W.3d at 236 ("Whether a granulated or broad-form charge is submitted, the trial court's duty is to submit only those questions, instructions, and definitions raised by the pleadings and the evidence.").

Except in certain "special proceedings in which the pleadings are specially defined by statutes, or procedural rules, *a party shall not be entitled to any submission of any question* raised only by a general denial and *not raised by affirmative written pleading by that party.*" Tex.R. Civ. P. 278 (emphasis added). And failure to submit a question, definition, or instruction "shall not be deemed a ground for reversal of the judgment unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment." *Id.* "Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived." Tex.R. Civ. P. 279. More-over, "if the trial court has 'to resolve a legal issue before the jury could properly perform its fact-finding role[,] ... a party must lodge an objection in time for the trial court to make an appropriate ruling without having to order a new trial.'" *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (quoting *Holland v. Wal–Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex.1999) (per curiam)).

The trial court has considerable discretion in determining proper jury instructions. *Thota*, 366 S.W.3d at 687. "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Id.* (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855–56 (Tex.2009)). An appellate court does not reverse a judgment for charge error unless the error was harmful "because it 'probably caused the rendition of an improper judgment' or 'probably prevented the petitioner from properly presenting the case to the appellate courts.'" *Id.* (quoting Tex.R.App. P. 44.1, 61.1).

In my view, every rule governing proper jury questions and instructions set out above would have been violated had the trial court submitted questions or instructions, at Dr. Benge's request, based on the theory that Dr. Benge's failure to disclose his intended use of an unqualified physician as a co-surgeon constituted a separate unpled and invalid cause of action of "failure to disclose" that did not constitute medical malpractice but as to which there was evidence and for which damages are separately recoverable so that it was required to be separately submitted to the jury. Thus, in my view, the majority opinion, which adopts each of these premises, erroneously construes the mandates of Rules of Civil Procedure 277, 278, and 279 and Rule of Appellate Procedure 44.1.

Only one liability theory was pled by Williams: breach of the standard of care of an ordinarily prudent surgeon performing an LAVH operation. Neither party pled breach of a statutory or separate common law duty to disclose. Rather, Williams alleged only that Dr. Benge violated the standard of care of an ordinarily prudent gynecological surgeon by failing to disclose that Dr. Giacobbe, for whom he had supervisory responsibility, would be performing half of Williams' LAVH operation by herself and that she had never done such an operation before and then by using her to perform 50% of the surgery and negligently supervising her work so that she pierced Williams' bowel, causing severe injuries. There was evidence from which the jury could have found all of these facts, and there was expert testimony that each of these acts was an act of malpractice.

The allegedly invalid theory of failure to disclose was not raised by the written pleadings, and Dr. Benge argued that it also was not raised by the evidence before arguing that it *was* raised by the evidence. Therefore, he cannot argue on appeal that the charge was improper under Rules 277 and 278. *See* Tex.R. Civ. P. 278 (requiring that trial court submit only questions and instructions "raised by the written pleadings and the evidence"). Dr. Benge did not ask the trial court to determine whether Williams had actually pled failure to disclose as a separate cause of action or to rule that the issue had been tried by consent, as required by *Osterberg. See* 12 S.W.3d at 55 (requiring that party lodge objection in time for trial court to make appropriate ruling if required "to resolve a legal issue before the jury could properly perform its fact-finding role"). He made no proper request for an instruction going to whether Williams was entitled to recover damages on the independent theory of recovery for failure to disclose that he now asserts on appeal, nor did he submit such an instruction in substantially correct

form, as required by Rule 278. *See* Tex.R. Civ. P. 278. Thus, he waived the complaints of jury charge error upon which he relies on appeal. *See* Tex.R. Civ. P. 279 ("Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived.").

There is absolutely nothing to show error in the charge in this case. Rather, review of the pleadings, the record, the evidence, and the rules of procedure confirms that submission of this case to the jury on a broad form negligence question was not only within the trial court's discretion but the *only* proper form for submission. *See* Tex.R. Civ. P. 277 (requiring that "the court shall, whenever feasible, submit the cause upon broad-form questions"); *E.B.*, 802 S.W.2d at 649 (interpreting "whenever feasible" as mandating broad-form submission "in any or every instance in which it is capable of being accomplished"); *Tex. Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 4.1 cmt.

The majority, however, concludes that Dr. Benge not only preserved error but showed reversible error in the jury charge. I turn, therefore, to the merits of Dr. Benge's argument on appeal that Williams' case included an invalid theory of liability that should have been submitted to the jury separately from her malpractice claim.

### C. Felton *and Breach of the Duty to Disclose*

The majority characterizes the evidence relating to Dr. Benge's failure to disclose that he was using an unqualified and inexperienced co-surgeon not as part of the evidence showing his breaches of the duty of care of a surgeon but as evidence that Williams' pleadings included as an invalid theory of liability separate from medical

negligence. In my view, this re-characterization of the theory of liability pled by Williams and tried to the jury has no valid basis either in Williams' pleadings or in the law. Yet the majority's holding depends entirely upon this re-characterization of the case at Dr. Benge's invitation and its interpretation of the law governing the physician's duty to disclose the use of an assistant.

As the majority states, the common law—the law that encompasses medical negligence—requires that a reasonable health care provider must disclose "the risks that would influence a reasonable patient in deciding whether to undergo treatment." Op. at 708 (quoting *Felton v. Lovett*, 388 S.W.3d 656, 661 (Tex.2012)). The common law risks that must be disclosed under *Felton* are those "inherent" in treatment, i.e., risks "that 'exist[ ] in and [are] inseparable from the procedure itself.'" *Felton*, 388 S.W.3d at 661. "Inherent risks of treatment are those which are directly related to the treatment and occur without negligence." *Id.* at 662.

*Felton* distinguished the common law duties of physicians from the statutory duty to disclose set out in Civil Practice and Remedies Code section 74.106, even as the court recognized that, "probably in all cases, the common-law and statutory duties are congruent." *Id.* at 661. "Malpractice, for example," the court pointed out, "is an extraneous risk, one that inheres in the *practice* of health care, not in the care itself," and thus is *itself not* an inherent risk of surgery that must be disclosed. *Id.* at 662 (emphasis in original).

Williams, however, made no claim that Dr. Benge failed to comply with the disclosure statute, Civil Practice and Remedies Code section 74.101. And her claim was not that Dr. Benge was liable to her for her injuries because he failed to disclose the use of a resident as an assistant.

Williams claimed that Dr. Benge did not use the standard of care of an ordinarily prudent gynecological surgeon in performing her LAVH; and she included, among Dr. Benge's acts of malpractice as a supervising surgeon responsible for the work of Dr. Giacobbe, his failure to disclose a *risk inherent in* in "the care itself," namely, the greatly increased risk that an inexperienced, unqualified surgeon performing laparoscopic-assisted vaginal surgery for the first time, by herself, with only the instructions and example of her co-surgeon on the other side of the patient's body as guidance, will make a mistake that a qualified surgeon who had performed an LAVH in the past would not make, causing harm to the patient. This is exactly the type of risk that must be disclosed under *Felton*. See *id.* at 661 (requiring that "a reasonable health care provider must disclose the risks that would influence a reasonable patient in deciding whether to undergo treatment"). The law does not permit physicians to use patients as guinea pigs without their consent. And doing so is exactly the type of act that is probative of breach of the professional standard of care.

Here, Williams paid for Dr. Benge's mistakes with her health and almost with her life. She did so not because Dr. Benge failed to disclose that he would be using an assistant but because, as Williams' gynecological surgeon, he had a duty to perform the surgery at a professional level. And the evidence—including expert testimony of the standard of care of a gynecological surgeon performing an LAVH procedure—shows that he used an unqualified physician to perform half the surgery; that he failed to disclose either to Williams or to his co-surgeon the extent of the surgery he expected his co-surgeon to perform; that it was risky to turn over half of this sophisticated surgery to someone who had never done this type of surgery; that

both his use of the physician he was supervising in this way and his failure to disclose his use of an unqualified co-surgeon to perform half of Williams' surgery were breaches of his professional standard of care; that the unqualified physician he was supervising perforated Williams' bowel; and that Williams almost died and suffered life-long injuries from this wound. A jury's consideration of *evidence* of duty, breach, causation, and injury in determining a physician's liability for breach of the standard of professional care and damages for a professional negligence claim is *not* consideration of commingled valid and invalid *theories* of liability.

Dr. Giacobbe testified that Dr. Benge did not disclose *even to her* the extent of the surgery she would be performing. The evidence is undisputed that he did not disclose this fact to Williams. Nor did Dr. Benge disclose that Dr. Giacobbe had never performed an LAVH. And Dr. Zepeda, Dr. Benge's own medical liability expert, agreed that "[a]bsolutely," doctors are always responsible for the acts of the residents they supervise, as did Williams' expert, Dr. Patsner. This is all critical evidence of breach of Dr. Benge's duties as a surgeon, and it is evidence that Dr. Benge wanted withheld from the jury in this malpractice case. To my mind, the jury was clearly entitled to consider this evidence, along with all the other evidence of Dr. Benge's breaches of the standard of professional care of an ordinarily prudent gynecological physician performing an LAVH, in making its decision whether Dr. Benge was medically negligent and thereby foreseeably caused Williams' injuries.

The majority does not point to any evidence in the record to rebut Dr. Patsner's expert testimony that the standard of care of a physician performing a hysterectomy includes a duty "to get permission from the patient for everybody who's going to be operating on them" or to rebut Dr.

Patsner's, Dr. Zepeda's, and Dr. Benge's testimony that Dr. Benge was responsible for any acts of negligence committed by Dr. Giacobbe, whom he was supervising and to whom he turned over half of Williams' surgery.

Instead, the majority assumes, contrary to the testimony and the pleadings, that there is *no* difference between "being just an assistant and being a co-surgeon"; that Dr. Giacobbe was only an assistant (which was a question for the jury); that there is no duty to disclose the intended use of an unqualified co-surgeon under the section of the MLA that deals with the risks of surgery; that this failure to disclose the risks of using an unqualified co-surgeon is *not* below the standard of care of a gynecological surgeon (despite expert testimony to the contrary); that, therefore, Dr. Benge could not have been committing malpractice when he handed over half the surgery to an unqualified co-surgeon and failed to disclose to Williams how he intended to perform the operation; that the claim that Dr. Benge violated the duty to disclose was, instead of evidence, a disguised separate and invalid theory of liability; that it was harmful error for the trial court to refuse to submit this unpled theory of liability to the jury separately from Williams' negligence theory; that it was also harmful error for the trial court to refuse to instruct the jury not to consider any evidence of what Dr. Benge told Williams about Dr. Giacobbe; and, because this invalid theory was not separately submitted and the evidence of failure to disclose was before the jury, that the jury probably found damages—or most or all of the damages—it attributed to Dr. Benge's malpractice only on the unpled and invalid theory of recovery for a violation of the MLA's disclosure requirement. All of these assumptions flow from the majority's initial mischaracterization of Dr. Benge's failure to disclose Dr. Giacobbe's lack of

qualification as a separate theory of liability from malpractice, rather than as one of a number acts from which the jury could have reasonably concluded that Dr. Benge breached the standard of professional care of a gynecological surgeon performing an LAVH, and from its conclusion that Dr. Benge preserved genuine errors in the charge.

Notably, although the majority's holding depends on its conclusions that it is *not* a breach of the professional standard of care for a surgeon to fail to disclose that an unqualified and inexperienced co-surgeon will be performing half of an operation and that this act is not a breach of any other duty, the majority does not make an argument from authority for these conclusions other than its construction of *Felton,* the argument that no other court has recognized the duty the majority introduces into the case and finds invalid, and an argument by analogy to medical battery. *See* Op. at 706–10.

I cannot agree with the majority that this case shows any error in the charge. This conclusion becomes even more compelling when the majority's holding that the trial court's jury charge error was so harmful that the judgment must be reversed and the case remanded for retrial under *Casteel* is considered.

**D.** **Casteel** *and the Commingling of Valid and Invalid Theories of Liability*

When a charge issue is properly preserved and contested on appeal, the appellate court reviews the basis of the complaint and reverses only if the alleged charge error was harmful. TEX.R.APP. P. 44.1(a) (stating standard for reversible error); *Thota,* 366 S.W.3d at 691.

In *Casteel,* the supreme court found harmful error because the single broad-form question submitted to the jury for violation of Insurance Code article 21.21 included not only the plaintiff's claims of liability for violations of the DTPA incorporated into the Insurance Code, for which he had standing, but also the plaintiff's claims for DTPA violations for which he did not have standing because he was not a consumer within the definition contained in the DTPA. *See* 22 S.W.3d at 386–87. Under *Casteel,* "when a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory." *Id.* at 388; *see also* TEX.R.APP. P. 44.1(a) (providing, "No judgment may be reversed on appeal ... unless the court of appeals concludes that the error complained of ... probably prevented the appellant from properly presenting the case to the court of appeals").

In *Harris County v. Smith,* the supreme court extended the *Casteel* holding to broad-form liability questions that commingle damage elements when an element is unsupported by legally sufficient evidence. 96 S.W.3d at 234. Under *Casteel* and *Smith,* the appellate courts "presume that the error was harmful and reversible and a new trial required when [they] *cannot determine whether the jury based its verdict solely on the improperly submitted invalid theory or damage element.*" *Bed, Bath & Beyond, Inc. v. Urista,* 211 S.W.3d 753, 756 (Tex.2006) (emphasis added).

*Casteel* and *Smith* both require that a plaintiff have actually *pled* an invalid theory of recovery and have then sought damages from the jury under a single broad-form liability question that permitted the recovery of damages on the invalid theory as well as on a valid theory. Here, the contention that the broad-form negligence question on liability submitted to the jury permitted the jury to award damages on an invalid theory of breach of a non-existent *unpled* and *unsubmitted* duty to dis-

close is entirely a *defensive* argument raised by *Dr. Benge*. What *Williams* asked the jury to find was whether Dr. Benge's act of using an undisclosed, unqualified co-surgeon to perform half of her LAVH surgery, among other acts, breached the standard of care of a gynecological surgeon and proximately caused her injuries. And she rested her case on her ability to prove that Dr. Benge's acts breached the standard of care of a gynecological surgeon performing an LAVH, causing her injuries and justifying the damages awarded her.

Nevertheless, Dr. Benge argues, and the majority concludes, that the single broad-form liability question on negligence submitted to the jury improperly sought damages on the unpled invalid theory Dr. Benge proposes. And Dr. Benge argues, and the majority concludes, that the unpled and unsubmitted invalid theory formed the primary or even "the sole basis of the jury's finding" that Dr. Benge committed malpractice, entitling Williams to damages. And Dr. Benge argues, and the majority concludes, that this separate, unpled, invalid cause of action on which the trial court submitted no question and no instruction to the jury so infected the damages award that the judgment must be reversed and the case tried again without it.

In my view, even assuming that Dr. Benge preserved a claim of error in the submission of the charge, what the majority views as an infectious unpled and unsubmitted—but considered—*theory of liability* is only *evidence* from which the jury could reasonably have concluded that Dr. Giacobbe did act as a co-surgeon; that she was not qualified; that her mistake caused Williams' injuries; and that Dr. Benge's performance as the sole disclosed surgeon and as Dr. Giacobbe's supervising physician fell below the standard of care of a surgeon performing an LAVH because he

knew of Dr. Giacobbe's lack of experience, used her as a co-surgeon anyway, failed to adequately instruct and supervise her, and failed to disclose either to Williams or to Dr. Giacobbe herself how he intended to use Dr. Giacobbe in performing the operation. I believe this evidence was properly submitted to the jury and is both legally and factually sufficient to support the jury's finding that Dr. Benge breached the standard of care of a reasonably prudent physician performing an LAVH, entitling Williams to damages for her injuries caused by the breach.

## Conclusion

The majority separates the failure to disclose the use of an unqualified resident as a co-surgeon from the professional duties of a supervising surgeon, declares it not to be an element of professional negligence, despite unrebutted expert testimony to the contrary, and requires that failure to disclose be pled separately as a statutory violation with its own damages. Thus, in my view, it dramatically broadens the scope of *Felton*. Likewise, it dramatically broadens the concept of reversibility on *Casteel* grounds by concluding that it was harmful error for the trial court *not* to submit this unpled and invalid theory of liability to the jury, improperly allowing the jury to award damages to Williams based, in part, on unrebutted expert testimony that Dr. Benge breached the professional standard of care of a gynecological surgeon performing an LAVH by, among other acts, failing to disclose his intention to use an unqualified co-surgeon to perform half of the surgery by herself. And it draws both of these conclusions despite Dr. Benge's failure to comply with any of the rules that would permit this Court to find that he preserved the charge error of which he complains on appeal.

The foreseeable result of the majority's holding is that its opinion will cause future litigants to attempt to do the same thing Dr. Benge has successfully done here: to re-characterize a properly pled, tried, and decided negligence case submitted to the jury on a broad-form liability question as one in which the pleadings did not mean what they said; one in which, as a matter of law, it is *not* an act of malpractice for a surgeon to fail to disclose that he is using a co-surgeon for an LAVH who has never performed the operation, has no qualifications to perform it, and nevertheless will be performing the entire operation on one-half of the patient's body; one in which evidence that a supervising physician failed to disclose his intended use of an unqualified and inexperienced co-surgeon may not even be submitted to the jury and is harmful error unless excluded; one in which a jury may be presumed to have awarded damages on a theory of recovery that is invalid, that was not pled, and that was not submitted to it in the charge either by questions or by instructions; one in which a carefully articulated damages question listing only elements of damages validly recoverable for medical negligence nevertheless conceals a finding of damages on an unpled and unsubmitted theory of breach of the statutory duty to disclose; and one in which the failure to separate out this unpled and unsubmitted theory of liability and exclude it from consideration is deemed to be harmful error by the trial court that requires reversal of the trial court's judgment by the appellate court and retrial *without* the same unsubmitted theory of recovery *and* also without material evidence of professional negligence related to duty, breach, and causation of the plaintiff's injuries.

The result of the majority's analysis is that this case is remanded to be *retried* on the *same* theory and *same* facts on which it was tried the first time, and to seek the *same* elements of damages under the *same*

charge—but with an instruction that evidence that Dr. Benge used an unqualified and inexperienced resident physician he was supervising as an undisclosed co-surgeon is not evidence of breach of the standard of professional care and must not be considered. Indeed, the majority effectively declares such evidence inadmissible.

For the foregoing reasons, I cannot join the majority opinion. I therefore respectfully dissent. Finding no error, I would affirm the judgment of the trial court.

## SUPPLEMENTAL OPINION ON MOTION FOR EN BANC RECONSIDERATION

The en banc court consists of Chief Justice RADACK and Justices JENNINGS, KEYES, HIGLEY, BLAND, MASSENGALE, BROWN, HUDDLE, and LLOYD.

HARVEY BROWN, Justice.

We limit our discussion to two issues raised in the opinions dissenting from the denial of en banc reconsideration: (1) whether Williams offered evidence on the lack of disclosure only to challenge Dr. Benge's credibility and (2) the nature of the jury-charge error for which we found presumed harm.

### I.

The dissent accepts Williams's contention that she raised the issue of lack of disclosure not for an invalid purpose (to obtain a finding that Dr. Benge violated the standard of care by failing to disclose) but for a valid one (to explain to the jury that it could, based on Dr. Benge's "deceit" of not telling Williams about Dr. Giacobbe's inexperience, draw a conclusion that Dr. Benge was untruthful when he testified at trial that the injury was caused by an electrical arc instead of medical negligence). This explanation is belied by the evidence and the closing arguments.

For example, in final argument, Williams did not argue that Dr. Benge's alleged deceit was relevant either to his credibility or to whether some other action he took or failed to take during or after the surgery violated the standard of care. Instead, the jury was told that the "deceit" itself violated the standard of care. Similarly, Williams's medical expert testified that Dr. Benge violated the standard of care by not telling Williams that Dr. Giacobbe would participate in the surgery.

After criticizing defense expert Dr. Toy's testimony that a physician does not have to "inform the patient [that] the resident will be performing the surgery," Williams told the jury, "[I]f that's what you want the standard to be, ... [g]o back and find for them." After talking further about the lack of disclosure, Williams argued, "[I]f you approve that standard today, that will become the standard. You disprove the standard today, you send them a message, the standard changes."

The last words to the jury asked it to establish a standard of care that requires surgeons to disclose resident participation:

> You know, we're trying to get you to enforce the safety rules here.... If you don't think they're important, put zero.... Can you imagine what will happen, though, if you do? ... They're going to go back [to] doing the same thing they've been doing: not telling people about who's doing the operation.

That is not a credibility argument; it is an argument about negligence and, specifically, negligence due to lack of disclosure.

## II.

The error in the jury charge was not simply the denial of Dr. Benge's proposed instruction, which, if given, could have appropriately confined the jury to consideration of only valid legal theories. It was also the submission, over Dr. Benge's objection, of a single broad-form jury question that mixed a valid and invalid theory, without any attempt to segregate them.

In *Casteel* and *Hawley*, charge error prevented the Court from determining whether the jury found liability on an invalid theory or basis. First, in *Casteel*, a single broad-form liability question mixed valid and invalid theories, and harm was presumed. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389–90 (Tex.2000); *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 227 (Tex.2005). Then, in *Hawley*, the trial court improperly denied a requested instruction. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 863–64 (Tex.2009). The Court noted that this was a different type of error and that, historically, jury-instruction error would not result in a court applying a presumed-harm analysis. *Id.* at 864. But the Court concluded that the presumed-harm test of Rule 61.1(b) nevertheless applied because the error precluded the reviewing court "from determining whether the jury found liability on an invalid basis." *Id.* at 865. The presumed-harm rule applied because the error "prevent[ed] proper presentation of the case on appeal." *Id.; see* Tex.R.App. P. 44.1(a)(2).

That same result has occurred here. Williams signed a patient-disclosure document authorizing her surgeon to be assisted in the surgery. Texas law does not recognize a duty on a supervising doctor to disclose a resident's participation beyond that disclosure. But Williams's expert testified that Dr. Benge violated the standard of care by failing to disclose that the resident would participate in the surgery. The jury was then asked, generally, whether Dr. Benge did what an ordinarily prudent surgeon would have done. In this framework, it is impossible to determine whether the act or omission that the jury found to have fallen below the standard of care was a permissible one, like surgical error or supervisory neglect, or an imper-

missible one, the much-discussed failure to disclose resident participation. Accordingly, harm is presumed.[1] *See Hawley*, 284 S.W.3d at 865; TEX.R.APP. P. 44.1(a)(2).

There were easy solutions to this error, including narrowing the question to inquire about negligence during or after the surgery or instructing that a failure to disclose could not form the basis for a finding of negligence.[2] Either would have prevented the error.

* * *

Juries are given the important task of absorbing and sifting through the evidence, weighing the credibility of witnesses, and applying the law as instructed to them to answer jury questions. We should trust them to perform this task by submitting proper jury questions and instructions. Nudging them with a jury question that mixes an invalid legal theory with a valid one demonstrates a distrust of their ability to correctly assess liability on the valid theory. Because the jury was given a jury question that failed to comply with the law, over Dr. Benge's objection, this case must be returned to the trial court.

Justice BROWN, writing a supplemental opinion on motion for en banc reconsideration, joined by Justice BLAND.

Justice JENNINGS, dissenting to the denial of en banc reconsideration with a separate opinion, joined by Justices KEYES and HIGLEY.

---

1. Even under the harmless-error test, Dr. Benge has established the requisite harm for reversal based on the repeated references throughout the trial to a violation of the standard of care by failing to disclose the resident's participation.

2. Thus, the trial court would not have been required to submit granulated liability questions, contrary to the preference for broadform questions established in Rule 277. *See* TEX.R. CIV. P. 277.

Justice KEYES, dissenting to the denial of en banc reconsideration with a separate opinion.

Justice LLOYD, dissenting to the denial of en banc reconsideration with a separate opinion, joined by Justices KEYES and HIGLEY.

TERRY JENNINGS, Justice, dissenting from denial of en banc reconsideration.

I respectfully dissent from the Court's order denying en banc reconsideration in this case.

For many years now, the civil bench and bar in Texas have been lamenting the "vanishing jury trial." In a recent *Texas Bar Journal* dedicated to addressing this grave concern, Texas State Bar President Trey Apffel explains that "lawyers should be committed to promoting and protecting the rule of law, standing firm for equal access to justice for all people, and educating the public that the right to a trial by jury is the very foundation of our liberties and freedoms."[1] This call to action is very appropriate, especially for members of the judiciary, in the year 2015, as we celebrate the 800th anniversary of Magna Carta, which first provided for public justice in a "certain place,"[2] trial by jury based on the evidence of "credible witnesses to the truth,"[3] equal protection of the law,[4] justices who "know the law of the

---

1. Trey Apffel, *President's Opinion: Protecting the Right to Trial by Jury*, 78 TEX. B.J. 194, 194 (2015).

2. MAGNA CARTA, ch. 17, in A.E. DICK HOWARD, MAGNA CARTA: TEXT & COMMENTARY 41 (1964).

3. *Id.* ch. 38, at 45.

4. *Id.* ch. 40, at 45 ("To no one will We sell, to none will We deny or delay, right or justice.").

land and will keep it well," [5] and the rule of law according to "the lawful judgment of [one's] peers and by the law of the land." [6]

However, in the very same *Texas Bar Journal,* the authors of another article boldly proclaim that the "days of the trial lawyer are essentially gone." [7] In addressing the fact that civil lawsuit filings are down seventeen percent in Texas in the last ten years, Texas Supreme Court Chief Justice Nathan Hecht notes, "Anytime there's that kind of a shift, then you've got to wonder what is happening. But I think right now, I'm not sure what the answer is." [8]

This case provides some illumination.

## Background

Although this Court has long struggled with the correct disposition of this appeal, the issues in this simple medical-negligence case are not hard. Seven years ago, in August 2008, appellee, Lauren Williams, who was thirty-nine years old, was admitted to Methodist Willowbrook Hospital ("Methodist") to undergo a laparoscopic assisted vaginal hysterectomy ("LAVH") by the surgeon with whom she contracted, appellant, Jim P. Benge, M.D. Benge worked for appellant, Kelsey–Seybold Medical Group, PLLC ("Kelsey–Seybold").

Something went terribly wrong during the surgery. After the LAVH, Williams showed signs of a serious infection and internal bleeding for almost three days. A subsequent surgery revealed that during the LAVH, she had suffered a rectal perforation and urethral injury. After undergoing a colostomy and urethral repair, doctors admitted Williams to the Intensive Care Unit ("ICU") in septic shock. They placed her in a medically induced coma for three weeks, and she required a mechanical ventilator to breath. Doctors also had to perform a tracheotomy on Williams because of her compromised pulmonary system. And she received antibiotic therapy and intravenous nutrition. In October 2008, Williams was released to a long-term acute care facility, where she spent a month recovering. She had to endure several subsequent surgeries, and she continues to suffer from the wounds inflicted upon her and complications resulting from her permanent colostomy.

### What went wrong during the LAVH?

At trial, Williams presented evidence that, unbeknownst to her, Dr. Benge had a Methodist resident, Dr. Lauren Giacobbe, perform forty to fifty percent of the surgery, even though Giacobbe had no previous experience performing the procedure. Williams also presented the shocking evidence that Benge did not tell her prior to the LAVH that a resident would be performing forty to fifty percent of her surgery, and he did not tell Giacobbe prior to the LAVH that she would be performing any part of Williams's surgery. This is especially surprising considering that Benge knew that Giacobbe had not previously performed an LAVH. Williams's evidence further reveals that during her long and painful recovery after the LAVH, Benge never informed her or her family of Giacobbe's part in the surgery. Indeed, according to Williams, she did not learn of

---

5. *Id.* ch. 45, at 47.

6. *Id.* ch. 39, at 45.

7. Tracy Walters McCormack & Christopher Bodnar, *Honesty is the Best Policy: It's Time to Disclose Lack of Jury Trial Experience,* 78 TEX. B.J. 210, 210 (2015).

8. Angela Morris, *Why are Filings Falling? Civil Lawsuits Down 17 Percent in 10 Years,* TEX. LAW., Mar. 9, 2015, *available at* http://www.texaslawyer.com/id=1202719819524/Why–Are–Filings–Falling–CivilLawsuits–Down–17–Percent–in–10–Years.Filings–Falling–CivilLawsuits–Down–17–Percent–in–10–Years.

Giacobbe's role in the LAVH until after she had filed this lawsuit.

Thus, in addition to presenting evidence of Dr. Benge's negligence, as a surgeon and supervisor of Dr. Giacobbe, Williams also presented compelling evidence that Benge did not properly prepare Giacobbe for her role during the LAVH and evidence calling into question Benge's credibility—evidence which is completely at odds with Benge's testimony that Williams "gave [him] consent to have Dr. Giacobbe participate in the surgery."

And because evidence was introduced that Dr. Benge believed that the injuries inflicted upon Williams during the surgery were caused by "an electrical arc from [a] Bovie," an electrical cauterizing instrument, and not his own negligence as a surgeon and supervisor, Benge's credibility was an issue that was front and center throughout the trial. Flatly rejecting Benge's testimony regarding causation, Dr. Bruce Patsner, Williams's medical expert, testified that the perforation of Williams's intestine was inflicted as the result of a surgical cut made during the vaginal portion of the procedure. Patsner opined that, based on reasonable medical probability, the perforation was caused by Dr. Giacobbe, who had no experience performing the procedure. Patsner further opined that Benge, while Williams suffered immediately after the LAVH, should have suspected a bowel injury and failed to timely and properly address Williams's post-operative complications, resulting in a "septic shock catastrophe."

In her Second Amended Petition, Williams sued Dr. Benge and Kelsey–Seybold only for negligence. And the only theory of liability that the trial court submitted to the jury was for negligence. In its charge, after supplying the jury with the standard definitions on "Ordinary Care," "Negligence," and "Proximate Cause," the trial court asked:

Did the negligence, if any, of any of those named below proximately cause Lauren Williams' injuries in question? Answer "Yes" or "No" for each of the following:

Jim Benge, M.D. _____

Carmen Thorton, M.D. _____

Lauren Williams _____

The jury answered "No" as to Dr. Thorton and Williams and "Yes" as to Benge.

### Instruction Error and Harm

Let there be no mistake: Williams did not plead, present any evidence, or ask the jury to find that Dr. Benge was in any way negligent in failing to inform her of "the risks and hazards involved" in the LAVH. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.101 (Vernon 2011). And the trial court did not submit any such issue to the jury to co-mingle with Williams's simple medical-negligence claim.

In a suit against a physician involving a health care liability claim that is "based on the failure of the physician . . . to disclose or adequately disclose the risks and hazards involved in [a] . . . surgical procedure rendered by the physician," "the *only theory* on which recovery may be obtained is that of *negligence in failing to disclose the risks or hazards* that could have influenced a reasonable person in making a decision to give or withhold consent." *Id.* (emphasis added). Thus, in regard to section 74.101, Dr. Benge only had a duty to inform Williams of "the risk and hazards involved" in the procedure as determined by the Texas Medical Disclosure Panel. *Id.* §§ 74.101–.103 (Vernon 2011). Not only did Williams not allege or present any evidence that Benge had violated this duty, she also did not dispute his evidence that he in fact did inform her of "the risks and hazards involved" in the LAVH, as required by section 74.101. Thus, section

74.101 simply does not apply in the instant case.[9]

Regardless, the panel majority concludes that the trial court's "single question [to the jury] ... 'effectively submitted' two different negligence questions." (Emphasis added.) In support of this conclusion, the panel majority creates a straw man, asserting:

> Under her unpleaded informed consent theory, Dr. Benge knew an inexperienced resident was going to perform a substantial portion of the surgery under his supervision *and he negligently failed* to provide that information to Williams before the operation.[10]

(Emphasis added.) It further asserts that Williams's evidence and what it characterizes as her "trial theme" "created the possibility of a liability finding based on either of the two negligence theories: negligence during and after the surgery and *negligence before the surgery in failing to disclose Dr. Giacobbe's participation or level of experience.*" (Emphasis added.)

Again, let there be no mistake: Williams did not assert that Dr. Benge had "negligently failed" to inform her that Dr. Giacobbe "was going to perform a substantial portion of the surgery." She expressly, and in no uncertain terms, stated that his testimony that she had actually "g[iven] him] consent to have Dr. Giacobbe participate in the surgery" was false. If Williams's presentation of the case had an underlying "theme," it was that Benge, prior to the LAVH, *intentionally* deceived her into believing that he would be her

---

9. As expressly explained by then Justice Hecht, when a health care liability claim is "not based on a failure to disclose the risks of [a] 'medical care or surgical procedure,' " section 74.101 does not apply. *Felton v. Lovett*, 388 S.W.3d 656, 660 (Tex.2012). And, "when [s]ection 74.101 does not apply, the common law does." *Id.* Moreover, "[s]ection 74.101 *does not purport to affect the common law in cases other than those the statute covers*, and nothing in the [statute] suggests a different intent." *Id.* at n. 10 (emphasis added) ("Whether a statute modifies or abrogates the common law depends on legislative intent." (citing *Energy Serv. Co. of Bowie, Inc. v. Superior Snubbing Servs., Inc.*, 236 S.W.3d 190, 194 (Tex.2007))).

Contrary to this reasoning, the panel majority claims that section 74.101 is part of "a comprehensive statutory scheme concerning disclosure and informed consent law." And the panel majority goes further astray, holding that "Texas law does not impose a legal duty to disclose to a patient specific information about a consented-to assisting surgeon's anticipated level of participation or experience." In support of this seminal and extraordinary holding, the panel majority relies on "the analysis" in *Haynes v. Beceiro*, 219 S.W.3d 24 (Tex.App.—San Antonio 2006, pet. denied).

Not only is the panel majority's interpretation of section 74.101 inconsistent with that of the Texas Supreme Court's interpretation, as expressly stated in *Felton*, but the analysis of the court in *Haynes* is simply not applicable in the instant case. In *Haynes*, the court held that the "battery claim" of Haynes, the plaintiff-patient, against Dr. Beceiro, an assisting surgeon, was precluded because Haynes had actually consented to Beceiro performing surgery on her. 219 S.W.3d at 26–27.

Here, in contrast, Williams has not sought to hold Dr. Giacobbe liable for "battery" or under any other liability theory. And she at no time has ever sought to hold Dr. Benge liable for any "battery" committed against her by Giacobbe. Indeed, the panel majority's reliance on *Haynes* reveals its fundamental mischaracterization of Williams's actual liability claims, which concern only Benge's negligence as a surgeon and supervisor of Giacobbe.

Thus, the premises upon which the panel majority relies do not support its extraordinary holding. And, as demonstrated below, the ultimate issue answered by the panel majority is not even properly before this Court.

10. Contrary to the panel majority's assertion, both parties stated at trial that this is "not an informed-consent case." As Williams's counsel explained to the trial court, "It's a negligence case."

surgeon, and, after the LAVH, *intentionally* withheld information from her and her family regarding Giacobbe's role in causing her injuries.

Although the parties and this Court have used the words "informed consent" and "disclosure" in a somewhat confusing manner, the record, when read in context, reveals that Williams's use of these terms in the trial court directly related to Dr. Benge's credibility, his breaking of his "bond" with her to perform the surgery himself, his lack of respect for her as a patient, and his complete lack of candor after the botched LAVH. For example, in her opening statement, Williams, without objection, asserted:

> *It is not Dr. Benge's choice to treat this patient as a human guinea pig.* He doesn't have that choice. It's the patient's choice.
>
> He made the choice for her, and he didn't tell her that Resident Lauren Giacobbe was going to do the procedure. He didn't tell her that the resident had never done the procedure before. *To this day, he didn't tell her that.*
>
> You see, after it was over, when the family was there at her bedside, he came and talked to them; *he didn't tell them the full story. He didn't tell her, the family first, that a resident did a significant amount of this procedure. When she woke up, he didn't tell her that a resident did a significant amount of this procedure.*

(Emphasis added.) In her closing argument, Williams, again without objection, emphasized:

> [W]ho did Lauren Williams hire to be her surgeon? Kelsey–Seybold, Dr. Jim Benge. He—she hired his hands, his experience; but under anesthesia, she got another set of hands working on her, some—a set of hands she did not know, who had never done the job before, had no experience. You can't do this in our

community. *And we didn't even find out about any of this until after this lawsuit was filed.*

. . . .

Doctors who don't use ordinary care have to be held accountable, and they agree with that. *As caretakers of our community, you also enforce the values that we have, and I believe in this city, in this state, your word is your bond. Dr. Benge's word that he was going to perform the surgery is his bond.* They may say "I want you to just look at the word 'resident' in that disclosure." I do want you to look at it, not just the word "resident," the whole sentence.

Was a resident necessary to do this procedure? No, because a nurse could've assisted in this procedure. Was the resident required? No, because Dr. Benge testified "I could do a hundred percent of this procedure."

So read the words, all of the words, not just the pieces that they want you to look at.

A contract—she hired Dr. Benge to do the surgery. He agreed to do the surgery. He didn't do all of the surgery. No matter how you parse it . . . .

. . . .

As caretaker of our community, *hold them to their word.* Make them do what they promise to do from here on out. "If you promise to do the surgery and you're in a private hospital, do the surgery." The fact that people at Ben Taub get more information than you do should be appalling to each and every one of you. When your family members, when you, your friends go into the hospital, you will now know "I need to ask some questions."

(Emphasis added.)

Moreover, Williams, in her closing, again without objection, made specific reference

to the fact, which she established through her medical expert, that the American Medical Association ("AMA") Code of Medical Ethics Opinion 8.16 states that "[a] surgeon who allows a substitute to operate on his or her patient without the patient's knowledge and consent is *deceitful.*" [11] Williams argued:

> Then we talk about what the national standards are. *I didn't say he was deceitful. That's what the AMA says.* The AMA says a surgeon who allows a substitute to operate on his or her patient without the patient's consent is *deceitful.*
>
> That's not me arguing. That's the AMA. These people are members of the AMA. That's their guidelines. That's what the AMA says.

(Emphasis added.) If the jury believed Williams's evidence that Dr. Benge did not tell her about Dr. Giacobbe's role in the LAVH, then it, considering the AMA's Code of Medical Ethics, could have reasonably believed that, in his dealings with Williams, he acted unethically and deceptively.[12]

---

**11.** AM. MED. ASS'N, COUNCIL ON ETHICAL AND JUDICIAL AFFAIRS, CODE OF MEDICAL ETHICS, CURRENT OPINIONS: OPINION 8.16–SUBSTITUTION OF SURGEON WITHOUT PATIENT'S KNOWLEDGE OR CONSENT (1994), *available at* http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medicical-ethics/opinion816.page (emphasis added). Opinion 8.16—Substitution of Surgeon without Patient's Knowledge or Consent, provides:

> A surgeon who allows a substitute to operate on his or her patient without the patient's knowledge and consent is *deceitful.* The patient is entitled to choose his or her own physician and should be permitted to acquiesce to or refuse the substitution. The surgeon's obligation to the patient requires the surgeon to perform the surgical operation: (1) within the scope of authority granted by the consent to the operation; (2) in accordance with the terms of the contractual relationship; (3) with complete disclosure of facts relevant to the need and the performance of the operation; and (4) utilizing best skill.
>
> It should be noted that it is the operating surgeon to whom the patient grants consent to perform the operation. *The patient is entitled to the services of the particular surgeon with whom he or she contracts. The operating surgeon, in accepting the patient, is obligated to utilize his or her personal talents in the performance of the operation to the extent required by the agreement creating the physician-patient relationship.* The surgeon cannot properly delegate to another the duties which he or she is required to perform personally.
>
> Under the normal and customary arrangement with patients, and with reference to the usual form of consent to operation, the operating surgeon is obligated to perform the operation but may be assisted by residents or other surgeons. *With the consent of the patient,* it is not unethical for the operating surgeon to delegate the performance of certain aspects of the operation to the assistant provided this is done under the surgeon's participatory supervision, ie, the surgeon must scrub. If a resident or other physician is to perform the operation under non-participatory supervision, it is necessary to make a full disclosure of this fact to the patient, and this should be evidenced by an appropriate statement contained in the consent. Under these circumstances, it is the resident or other physician who becomes the operating surgeon. (I, II, IV, V).

*Id.* (emphasis added).

**12.** *See* TEX. PENAL CODE ANN. § 31.01(1) (Vernon Supp.2014) (providing multiple definitions of "deception," including "promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed" and "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true"); *Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC,* 324 S.W.3d 840, 850 (Tex.App.—Houston [14th Dist.] 2010, no pet.) (listing, as an element of "fraud by nondisclosure," "the defendant failed to disclose facts to the plaintiff"); *see also* BLACK'S LAW DICTIONARY 492 (10th ed. 2009) (defining "deception" as "[t]he act of deliberately causing someone to believe that something is true when the actor knows it to be false"); *id.* at 491 (defining

Just because Williams referred to the facts that she had a contract with Dr. Benge to perform the LAVH and he had broken his "bond" with her, does not mean that she was asking the jury to find him liable for breach of contract. Likewise, just because Williams referred to the facts that Benge did not tell her that he was going to have a resident perform forty to fifty percent of the surgery and, thus, acted "deceitful[ly]" and unethically as per the AMA, does not mean that she was, as claimed by the panel majority, asking the jury to find that *"he negligently failed to provide that information to Williams before the operation."* (Emphasis added.) Simply put, the fact that Williams presented evidence and argued that Benge violated the standards of the AMA's Code of Medical Ethics did not transform her medical-negligence case into an "informed-consent" case.

Nevertheless, the panel majority, based entirely upon its own characterization of Williams's case, and not the case that she actually tried, proceeds to knock down its straw man, holding that the trial court's "broad form negligence question effectively included an informed consent issue and therefore violated" *Crown Life Insurance Co. v. Casteel,* 22 S.W.3d 378 (Tex.2000). In support of this holding, the panel majority relies on *Casteel, Columbia Rio Grande Healthcare, L.P. v. Hawley,* 284 S.W.3d 851 (Tex.2009), and *Texas Commission on Human Rights v. Morrison,* 381 S.W.3d 533 (Tex.2012). However, neither *Casteel* nor *Hawley* nor *Morrison* supports the panel majority's holding.

In *Casteel,* the Texas Supreme Court held,

> [W]hen *a trial court submits* a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory. *See* Tex.R.App. P. 61.1 ("No judgment may be reversed on appeal ... unless the Supreme Court concludes that the error complained of ... probably prevented the petitioner from properly presenting the case to the appellate courts."); *see also* Tex.R.App. P. 44.1(a).[13]

22 S.W.3d at 388 (emphasis added). In reaching its holding, the court noted that the trial court's jury charge contained "a single broad-form liability question" containing instructions "on thirteen independent grounds for liability," four of which were invalid because they "required ... consumer status," which the plaintiff did not have. *Id.* at 387–88.

In *Hawley,* the supreme court, in an issue that it labeled as "Failure to Give the Instruction," held that the trial court erred in not instructing the jury, as requested by the defendant-hospital, that it could not consider the acts or omissions of a defendant-doctor, who was not an agent of the hospital, when determining the hospital's negligence. 284 S.W.3d at 862–65. The trial court's liability question asked, "Was the negligence, if any, of [the defendant-hospital], a proximate cause of injuries to [the plaintiff]?" *Id.* at 863. The court

"deceit" as "[t]he act of intentionally leading someone to believe something that is not true").

**13.** In stark contrast to the Texas Supreme Court's holding in *Casteel,* the Texas Court of Criminal Appeals, in affirming judgments imposing the death penalty in two separate capi-

tal-murder cases, held that where a "trial court's charge authorize[s] [a] jury to convict on alternative theories, the verdict of guilt will be upheld if the evidence [is] sufficient *on any one of the theories."* *Sorto v. State,* 173 S.W.3d 469, 472 (Tex.Crim.App.2005) (emphasis added) (citing *Rabbani v. State,* 847 S.W.2d 555, 558–59 (Tex.Crim.App.1992)).

noted that the trial court had instructed the jury that the defendant-hospital "acts or fails to act only through its employees, agents, nurses, and servants" and certain evidence showed that the defendant-doctor worked in an office in the hospital and had "input" in the hospital's policy that its pathologists were to verbally notify doctors when a patient, like the plaintiff, was diagnosed with cancer. *Id.* The court explained that because the trial court had not defined the word "agent," the jury could have erroneously considered the defendant-doctor to be an agent of the defendant-hospital. *Id.*

After concluding that the trial court had erred in denying the defendant-hospital's requested instruction, the supreme court, under the sub-heading of "Harm," concluded that the harm analysis of rule 61.1(b) "applies ... because the jury could have found [the defendant-hospital] liable based on [the defendant-doctor's] acts or omissions under the charge as given, and there is no way for [the defendant-hospital] or an appellate court to tell if it did so." *Id.* at 865.

In the instant case, the panel majority cites *Hawley* for the following proposition:

If one of the plaintiff's legal theories does not support liability as a matter of law and *the plaintiff presented evidence to the jury on that theory* that may have led the jury to answer affirmatively the broad-form liability question incorporating the invalid theory, *there is a Casteel-type charge error. See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 863–65 (Tex.2009) (broad-form negligence question included instruction that hospital acts through its employees, agents, nurses, and servants but did not inform jury that hospital is not legally liable for acts of independent contractor-physician and, as result, appellate court could not tell if jury impermissibly found hospital liable for acts of

doctor where evidence raised that possibility).

(Emphasis added.) The panel majority's characterization, in its published opinion on the merits, of *Hawley* is flat wrong.

In fact, the supreme court in *Hawley* expressly agreed with the plaintiff that "the harm question presented in *Casteel* is *different* from that presented here *because here the charge did not submit an invalid theory to the jury.*" 284 S.W.3d at 865 (emphasis added). It noted that submission of an invalid theory involves a trial court's error in instructing a jury to consider erroneous matters and the defendant-hospital "d[id] not contend that the jury was allowed to consider an improper theory of liability by the charge that allowed the hospital to be held liable for actions of its agents." *Id.* The court explained, thus,

[T]he presumed harm analysis of Rule 61.1(b) was applied in *Casteel* and *Harris County* to a different jury charge problem than is presented here. *See Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 756 (Tex.2006) ("We specifically limited our holdings in *Casteel* and *Harris County* to submission of a broad-form question incorporating multiple theories of liability or multiple damage elements.").

*Id.* Even though the court considered *Casteel* inapplicable, it did apply the harm analysis of rule 61.1(b) in *Hawley* "because the jury could have found [the defendant-hospital] liable based on [the defendant-doctor's] acts or omissions under the charge as given, and there is no way for [the defendant-hospital] or an appellate court to tell if it did so." *Id.* In doing so, the court made sure to note that "in most cases where a trial court errs by refusing to give a proposed instruction the harm analysis will be based on whether the refusal probably caused the rendition of an

improper judgment." [14] *Id.; see also* Tex. R.App. P. 61.1(a).

In *Morrison*, the supreme court, following its precedent in *Casteel*, held that because the broad-form liability question submitted to the jury by the trial court "allowed liability for *'adverse personnel actions,'* the jury could have improperly found liability based upon [a] denied promotion," which constituted an invalid theory of liability. 381 S.W.3d at 537 (emphasis added). Prior to filing her suit against the defendant-employer for retaliation, the plaintiff-employee, in *Morrison*, filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which is a prerequisite to suit against a government entity like the defendant-employer. *Id.* at 535–37 (citing Tex. Gov't Code Ann. § 311.034 (Vernon 2013)). The plaintiff's EEOC complaint "included several bases for discrimination," but not the denied promotion. *Id.* at 535.

The trial court did not define "adverse personnel actions" in the jury charge, and the defendant specifically objected, arguing that the trial court's use of the term "adverse personnel actions" would "allow the jury to find liability without unanimity because there were multiple occurrences the jury could view as adverse personnel actions." *Id.* The defendant then "tendered a liability question that focused solely on the termination," but the trial court denied the request. *Id.* In reaching its holding, the supreme court explained that because the trial court submitted the liability question in a way that "prevent[ed] [the] parties [and] the Court from knowing for certain what theory the jurors relied upon," the defendant was "prohibited from demonstrating on appeal that the jury's verdict was based upon the invalid legal theory." *Id.* at 537. In other words, the supreme court "presumed" harm as it did in *Casteel*. *Id.* at 534, 536, 538.

Here, unlike in *Casteel* and *Morrison*, the trial court simply did not in its charge to the jury submit a single broad-form liability question that erroneously commingled valid and invalid theories of liability. As previously explained by the supreme court, submission of an invalid theory of liability necessarily involves a trial court's error in affirmatively instructing a jury to consider erroneous matters. *Hawley*, 284 S.W.3d at 865. And the supreme court has "specifically limited [its] holdings in *Casteel* and *Harris County* to *submission* of a broad-form question incorporating multiple theories of liability or multiple damage elements." *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 756 (Tex. 2006) (emphasis added).

As in *Hawley*, the trial court here did in fact deny Dr. Benge's request for an instruction. [15] He requested that the trial

---

14. In its "Supplemental Opinion," the panel majority appears to recognize that the supreme court in *Hawley* actually addressed "jury-instruction error." However, the panel majority, unlike the supreme court in *Hawley*, does not address the issue of whether the trial court actually erred in denying Dr. Benge's requested instruction. Instead, it continues to presume error, and that it was preserved, and then it presumes harm. And the panel majority's published opinion, which mischaracterizes *Hawley* as a case involving "*Casteel*-type charge error" and a "broad-form negligence question," has not been withdrawn and still stands. *See* Tex.R.App. P. 47.7 cmt. ("All opinions and memorandum opinions in civil cases issued after the 2003 amendment have precedential value."); *see also First Gibraltar Bank, FSB v. Christian*, No. 14–94–01212–CV, 1995 WL 645120, at *1 (Tex.App.—Houston [14th Dist.] Nov. 2, 1995, writ denied) (not designated for publication) ("[P]ublished opinions setting forth the analysis and decisions of federal and state courts ... constitute legal authority or precedent.").

15. In its "Supplemental Opinion," the panel majority, continuing in its erroneous reliance on *Casteel*, asserts that the error in this case "was not simply the denial of Dr. Benge's proposed instruction," but rather "also the submission ... of a single broad-form jury

court instruct the jury:

You are instructed that in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery.

Thus, under the supreme court's holding and reasoning in *Hawley*, the panel majority was required, before presuming harm under rule 66.1(b), to determine first whether the trial court had erred in denying Benge his requested instruction. And if, and only if, the trial court erred in denying this instruction, then, and only then, should the panel have considered whether, from the trial court's error, harm should be presumed under rule 66.1(b). *Hawley*, 284 S.W.3d at 865.

First, it should be noted that Dr. Benge, prior to asking for the above instruction for the first time in the charge conference, had already waived any error in regard to Williams's statements, evidence, and arguments about "informed consent" or "disclosure." Although the trial court had initially granted Benge's motion in limine on the topic, and even sustained one of his objections, the record reveals that Benge repeatedly failed to object when he was required to do so. In fact, the record reveals that he made only two objections during the presentation of the evidence and none during Williams's opening statement and closing argument. And he, himself, extensively testified that he had

warned Williams of the risks and hazards involved in the LAVH and Williams had "g[iven him] consent to have Dr. Giacobbe participate in the surgery."[16] At one point, while Williams had her medical expert on direct examination and Benge objected to a question about her lack of consent, the following exchange occurred:

[William]: One other thing, Judge. They Spent a fair amount of time going through the informed consent page with Dr. Benge, and he—they asked him a question, "Did you get proper informed consent?" "Yes, I did." They've waived that already.

[Dr. Benge]: Don't believe we have waived it because we had a running objection at the beginning of the case.

[Williams]: Can't have a running objection to your own questions.

[Dr. Benge]: Yeah.

Second, even if Dr. Benge had not waived the issue, the trial court did not err in denying the instruction that he requested. Again, he requested that the trial court instruct the jury that "in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery." He did not request that the trial court instruct the jury to consider such evidence only in determining his credibility and for no other purpose; thus, his proposed instruction was overbroad. Because

question that mixed a valid and invalid theory." However, the panel majority never actually addresses, in either its published opinion or "Supplemental Opinion," whether the trial court erroneously denied Benge's proposed instruction or whether he preserved such error for our review. Notably, Benge, in his appellant's brief, expressly states that "[t]he trial court erred when it refused [his] request for an instruction in the charge clarifying that the jury could not find [him] liable on th[e] informed-consent ground."

16. Dr. Benge, at the beginning of trial, requested "a running objection to the questions about informed consent," which the trial court granted, although it cautioned, "I will tell you I'm not sure if it holds water when we get to the appellate level." Benge's "running objection" became null, however, when he, himself, testified about "informed consent." *See Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex.2007) (error in admission of evidence waived if objecting party permits same or similar evidence to be introduced without objection).

the complained-of evidence directly concerned the issue of Benge's credibility and the evidence showed that he believed that an "electrical arc from [a] Bovie" had caused Williams's injuries, the jury was entitled to consider any evidence of his "deceitful[ness]" in deciding whether to reject his explanation of causation. And, again, Williams certainly had the right to refute Benge's testimony that she had in fact "g[iven him] consent to have Dr. Giacobbe participate in the surgery," which also served to impeach his credibility. Thus, Benge's requested instruction, as written, would have misled the jury into thinking that it could not consider the complained-of evidence to assess his credibility for determining the ultimate issue in the case.

Third, even if the trial court had erred in denying Dr. Benge his requested instruction, this is not a case where harm should be presumed under rule 66.1(b), as it was in *Hawley*. Again, as explained by the Texas Supreme Court, "in most cases where a trial court errs by refusing to give a proposed instruction the harm analysis will be based on whether the refusal probably caused the rendition of an improper judgment." *Hawley*, 284 S.W.3d at 865; *see also* Tex.R.App. P. 61.1(a). Rule 61.1(b) does not apply here because the jury could not, as asserted by the panel majority in its characterization of Williams's case, have found Benge liable based on a theory that he *negligently failed* to provide that information to Williams before the operation." (Emphasis added.)

Again, Williams simply did not assert that Dr. Benge had "negligently failed" to inform her that Dr. Giacobbe "was going to perform a substantial portion of the surgery." Rather, she pulled no punches and directly accused Benge of being intentionally "deceitful" and unethical, citing his violation of the AMA's Code of Medical Ethics. And she expressly, and in no uncertain terms, stated that his testimony that she had actually "g[iven him] consent to have Dr. Giacobbe participate in the surgery" was false. Thus, to the extent that the panel majority, in characterizing the "theme" of Williams's case, relies on Dr. Patsner's testimony that Dr. Benge's "betrayal" in not "explain[ing] who was doing the surgery on Ms. Williams" was "outside the standard," it errs.

Finally, it should be noted that because Dr. Benge has conflated *Casteel*-type submission error, where harm is presumed, with error regarding the denial of a requested instruction, where error is most often not presumed, Benge, in his appellant's brief, did not present this Court with a harm analysis as required. *See* Tex. R.App. P. 38.1(i).

In sum, the panel majority, in characterizing Williams's case for her, sets up the straw man that she "effectively" presented to the jury an "unpleaded informed consent theory" and asked it to find that Dr. Benge "negligently failed" to inform her that he intended to use "an inexperienced resident" "to perform a substantial portion of the surgery." It then knocks down the straw man, holding that the trial court's "broad form negligence question effectively included an informed consent issue and therefore violated *Casteel*." In reaching this holding, the panel majority not only misinterprets *Casteel* and *Morrison*, but conflates "*Casteel*-type charge error," i.e., error involving a trial court's submission of multiple theories of liability, with error involving the denial of a requested instruction.

More important, in doing so, the panel majority, in its published opinion on the merits, disregards the Texas Supreme Court's actual holding in *Hawley*, mischaracterizes the court's opinion as relying upon *Casteel* in presuming harm, despite the fact that it expressly states that *Casteel* is "different," and then cites *Hawley*

in support of its holding. *See Hawley*, 284 S.W.3d at 865. In doing so, the panel extends the holding of *Casteel* regarding presumption of harm in cases involving the erroneous submission of multiple liability theories to cases involving the denial of a requested instruction. And the panel majority does this in spite of the fact that the supreme court in *Hawley* expressly stated, "in most cases where a trial court errs by refusing to give a proposed instruction the harm analysis will be based on whether the refusal probably caused the rendition of an improper judgment."[17] *Id.; see also* Tex.R.App. P. 61.1(a).

Here, the panel majority reverses the trial court's lawful judgment entered in favor of Williams, not on a legitimate legal point of error, but upon a wholly manufactured appellate issue. In doing so, the panel majority not only wrongfully deprives Williams of her lawfully rendered verdict and judgment, it also unnecessarily places upon her the burden of yet more expense and delay in securing justice. And because the panel majority misapplies the holdings and reasoning of the Texas Supreme Court in *Casteel, Hawley,* and *Morrison,* the panel majority's error is of such magnitude that it should be corrected by this court sitting en banc or by our high court. *See* Tex.R.App. P. 41.2(c) ("[E]xtraordinary circumstances require en banc consideration."); Tex. Gov't Code Ann. § 22.001(a)(6) (Vernon 2004) ("The supreme court has jurisdiction [when] ... it appears that an error of law has been committed by the court of appeals.").

## Conclusion

This case serves as a cautionary tale and illustrates the dangers encountered when courts engage in deciding cases ad hoc and not in accord with established precedent. Such decision making, not only unnecessarily adds time and expense to the disposition of a case, doing a disservice to the litigants, but also undermines the rule of law. If the rule of law means anything, it means that judges are bound to follow well-established and sound legal precedent. Although we, as intermediate appellate court justices, are certainly free to point out any flaws in the reasoning of the opinions of our high courts, we are not free to disregard binding precedent.

Why in Texas are the rights to public justice and civil trial by jury vanishing? Some might reasonably argue that these rights are, to a large extent, vanishing because of the acts and omissions of our courts—the very same entities that were created to serve and maintain them. The problem is not new. In making the case for reform of the Court of Chancery in nineteenth century England, Charles Dickens, in *Bleak House,* wrote:

> This is the Court of Chanery; ... which so exhausts finances, patience, courage, hope; so overthrows the brain and breaks the heart; that there is not an honorable man among its practitioners who would not give—who does not often give—the warning, "Suffer any wrong that can be done to you, rather than come here!"[18]

---

**17.** After again presuming harm, after first presuming error, in its "Supplemental Opinion," the panel majority asserts that "[t]here were easy solutions" to correct the trial court's error, such as "narrowing the [jury] question to inquire about negligence during or after the surgery or an instruction that a failure to disclose could not form the basis for a finding of negligence." However, Dr. Benge did not ask for either of these reme-
dies, instead he merely requested an overly broad jury instruction, which the trial court would have erred in submitting. *See Fibreboard Corp. v. Pool,* 813 S.W.2d 658, 670 (Tex.App.—Texarkana 1991, writ denied) (concluding instruction "overly broad" where it would have prevented jury from considering evidence for valid purposes).

**18.** Charles Dickens, Bleak House 13 (Stephen Gill ed., Oxford Univ. Press 2008) (1853).

As illustrated by Dickens's tale, if we, as lawyers and judges in the year 2015, want to preserve and protect the 800–year–old legacy of Magna Carta, we must be ever vigilant in the performance of our duties as stewards and "guardians of the law." [19] If we fail in fulfilling these critical duties, not only will we ultimately · render ourselves irrelevant, but the rule of law, guaranteed by Magna Carta, will become a mere memory. Thus, our profession should address Chief Justice Hecht's concern about the vanishing jury trial and answer State Bar President Apffel's call to action to "stand[ ] firm for equal access to justice" and educate the public that "the right to trial by jury is the very foundation of our liberties and freedoms." [20] We should, in the words of President Lincoln, re-dedicate and "take increased devotion to" [21] our solemn duties to protect the rule of law.

And if we, on the bench and in the bar, really want to provide real access to civil justice for all, preserve the civil right to trial by jury, and maintain the rule of law, we should, first and foremost, not deprive a party of justice by taking from her a lawfully-obtained judgment. Like good doctors, we should first do no harm.

**EVELYN V. KEYES**, Justice, dissenting from denial of en banc · reconsideration.

I respectfully dissent from the Court's denial of en ·banc reconsideration. The majority opinion, in my view, is based on misreadings of two seminal Texas Supreme Court cases, *Felton v. Lovett* and *Crown Life Insurance Co. v. Casteel*, with grave consequences for Texas law.

First, the majority reconstitutes the plaintiff Williams' case and, in my view, misconstrues the Texas Supreme Court's holding in *Felton v. Lovett* as to the scope of Texas's informed consent statute, Civil Practice and Remedies Code section 74.101, and erroneously claims that Williams covertly tried an unpled and invalid cause of action under that statute disguised as a malpractice claim. Second, it misconstrues the Texas Supreme Court's opinion in *Crown Life Insurance Co. v. Casteel* as requiring it to reverse this case and remand for a new trial because it concludes the jury might have awarded unspecified damages on that unpled, invalid claim as to which no error was specifically alleged or preserved, instead of awarding damages on the malpractice claim Williams actually did plead and submit to the jury on a broad-form question as to liability for professional negligence.

19. *See* Tex. Disciplinary Rules Prof'l Conduct preamble ¶ 1, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (Vernon 2013). For example, in order for our adversarial system to function properly, lawyers, in zealously representing their clients, must always be mindful of their duties to disclose to courts controlling authority "adverse to the position" of their client, not "make a false statement of material fact or law to a [court]," and not "take a position that unreasonably increases the costs or other burdens of the case or that unreasonably delays resolution of [a] matter." *Id.* at R. 3.02, 3.03(a)(1), (a)(4). And judges, as neutral referees, must always "comply with the law" and "accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law." Tex. Code Jud. Conduct, Canons 2(A), 3(B)(8), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. B (Vernon 2013).

20. Apffel, *supra* note 1, at 194; Morris, *supra* note 8.

21. Abraham Lincoln, Address at the Dedication of the Cemetery at the Gettysburg, Pennsylvania (November 19, 1863), *reprinted in* Abraham Lincoln: The Gettysburg Address and Other Speeches 82 (1995).

In restating Williams' case, the majority claims that when Williams pled that Dr. Benge committed professional malpractice by, inter alia, secretly using an unqualified resident physician to perform fifty percent of her laparoscopic-assisted vaginal hysterectomy surgery ("LAVH"), she was actually pleading that Dr. Benge violated the informed consent statute by failing to obtain her consent to his use of a resident. The majority holds that Williams' unpled informed consent claim was invalid because a claim that Dr. Benge failed to obtain Williams' consent to the use of a resident does not concern a risk inherent in an LAVH surgery for which section 74.101 requires consent. It then finds that the jury improperly considered this unpled and invalid claim and awarded unspecified damages on it, so it is required to reverse and remand this case.

The majority's restatement of the case, in my view, distorts Williams' actual pleadings, the nature of the trial, and the law regarding the informed consent statute, malpractice, and jury charge error. Williams made no claim that she suffered damages because Dr. Benge failed to inform her that he was using a resident to assist him, and she made no claim for any damages traceable to any such claim. Williams plainly pled that Dr. Benge secretly used an unqualified resident physician, who had never performed an LAVH, as a co-surgeon to perform half of her surgery; that this was an act of malpractice that violated the canons of professional ethics and the professional standard of care of a surgeon; and that this concealed use of an unqualified co-surgeon directly caused her injuries when that unqualified co-surgeon perforated her bowel, causing her life-threatening and life-altering injuries. Williams' and Dr. Benge's expert witnesses both testified that the use of a secret unqualified co-surgeon to perform half of an LAVH violates the professional standard of care of a reasonable and prudent physician. There was no testimony that Dr. Benge failed to disclose his use of a resident; that Williams was entitled to such a disclosure under the informed consent statute; or that Dr. Benge's failure to obtain her consent to the use of a resident violated his statutory duty of disclosure and caused her damages. Nor was any such theory of recovery pled either by Williams affirmatively or by Dr. Benge defensively.

In making its argument for reconstructing the case, the majority, in my judgment, misconstrues the holding in *Felton v. Lovett*, in which the Texas Supreme Court construed the informed consent statute, Civil Practice and Remedies Code section 74.101, and stretches the scope of the statute beyond all recognition. What *Felton* actually says—directly contrary to what the majority holds—is that a physician has a statutory duty to disclose to his patient *"risks inherent in treatment"* that *"occur without negligence,"* but that there is no duty to disclose malpractice under the statute. *See* 388 S.W.3d 656, 661–62 (Tex. 2012) (emphasis added) (stating that section 74.101 "requires[s] disclosure of risks 'inherent' in treatment," i.e., risks that "exist[ ] in and [are] inseparable from the procedure itself .... even if treatment is proper and properly administered.... Inherent risks of treatment are those which are directly related to the treatment and occur without negligence."). *Felton* also expressly states, "Malpractice ... is [a] risk ... that inheres in the *practice* of health care, not in the care itself. Thus, *the inherent risks of surgery do not include the possibility that it may be ... negligently performed."* *Id.* at 662 (emphasis in original and added). Because the only claim Williams made was for malpractice, the plain language of *Felton* takes her claim outside the scope of claims made under the informed consent statute.

In a proper informed consent case, the plaintiff seeks damages for injuries inherent in a properly performed procedure which he claims he would not have consented to had the physician disclosed to him those inherent risks. *See Hood v. Phillips,* 554 S.W.2d 160, 166–67. (Tex. 1977) (holding submission of issue of informed consent to jury was proper where patient claimed physician failed to warn him of risks of numbness, heart attack or stroke, and lack of success inherent in medically unaccepted treatment for emphysema from which patient suffered injury and where defendant physician testified he did disclose those risks). However, the risk that an unqualified co-surgeon will pierce a patient's bowel is *not a risk inherent in a properly performed LAVH* and thus subject to statutory disclosure. It is, instead, a *foreseeable risk of a negligently performed procedure*—the very cause of action Williams pled and tried. *See id.* at 165 (burden of proof on a patient-plaintiff in a medical malpractice suit is "to establish that the physician-defendant has undertaken a mode or form of treatment which a reasonable and prudent member of the medical profession would not have undertaken under the same or similar circumstances").

Dr. Benge's failure to disclose his intent to use a person who had never done this laser-assisted surgery before to perform half of the LAVH concealed from Williams his breach of the standard of care of a reasonable and prudent LAVH surgeon. Dr. Benge's breach in using an unqualified resident as a co-surgeon foreseeably resulted in the perforation of Williams's bowel. That is not a mere failure to disclose the use of an assistant as a risk of a properly performed LAVH. That is evidence of breach of the standard of care of a reasonable and prudent physician by the use of a secret unqualified co-surgeon, as both experts testified. Thus, this is not an inherent risk of surgery to which the stat-

utory duty to disclose could apply. *See Felton,* 388 S.W.3d at 661–62 (defining "risks inherent in treatment"). Section 74.101 has no relevance to this case. The invalid theory of liability found by the majority to have been improperly submitted to the jury in the broad-form negligence question is simply not there.

The majority compounds its error when it opines that the Texas Supreme Court's opinion in *Crown Life Insurance Co. v. Casteel* not only allows but requires it to remand this case to the trial court for retrial with the inclusion of an instruction that the jury must not consider as evidence of malpractice any evidence that Dr. Benge concealed from Williams his use of an unqualified co-surgeon during the LAVH. The majority's justification for this holding is that this evidentiary instruction averts the danger that the jury *might* have awarded *unspecified* damages on the *unpled* and invalid theory of an alleged breach of the statutory duty to disclose the use of an assistant. But the invalid theory is entirely of the majority's own making, and the evidence it orders the trial court to instruct the jury not to consider is material evidence of malpractice, or medical negligence. The case was, in fact, properly submitted to the jury on a broad-form liability question as to medical negligence—the *only* theory pled and tried by Williams.

*Casteel* holds just the opposite from the majority—namely, that the trial court's submission of a case to the jury on a single broad-form liability question is harmful error requiring reversal when it permits the jury to find an unspecified improper element of damages on an invalid theory that was actually *pled along with a valid theory* and submitted to the jury—not on an invalid and non-existent theory of liability that was *not* pled. *See* 22 S.W.3d 378, 387–88 (Tex.2000). Here, nothing was

pled but Williams' malpractice claim—a valid theory of recovery of damages for her injuries. And all of the damages Williams sought and the jury awarded—$240,000 in damages for past and future pain and mental anguish, $302,609 for past and future lost earning capacity, $20,000 for past and future physical impairment, and $1,332,960.14 for past and future medical expenses—were properly recoverable for the injuries Williams suffered as a direct result of Dr. Benge's medical negligence. None of these damages is a type of damages that cannot be recovered for malpractice or might have been recovered on some other theory that was pled and tried, because there was no such theory.

No damages were sought and submitted to or awarded by the jury that might reasonably be mistaken as resulting from anything other than the injuries Williams directly received from Dr. Benge's acts of malpractice. No damages were sought or were attributable to a claim that Dr. Benge caused Williams' injuries by failing to obtain her consent to risks inherent in a properly performed LAVH procedure. Thus, as it misconstrues and expands *Felton* and section 74.101, so the majority opinion also misconstrues and expands *Casteel* into the realm of unlimited speculation as to what a jury *might* have told itself about an unpled and inapplicable cause of action about which it was asked no question and given no instruction.

The damage done by the majority's reading of *Casteel* extends far beyond this case to the courts' application of *Casteel* in reversing cases submitted to the jury on broad-form liability questions long mandated by the Texas Supreme Court and by the Texas Rules of Civil Procedure. *See* TEX.R. CIV. P. 277 (mandating broad-form submission "whenever feasible"); *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990) ("Rule 277 mandates broad form submission 'whenever feasible,'

that is, in any or every instance in which it is capable of being accomplished."). On the majority's reasoning, broad-form submission is never feasible when an appellate court can conceive of an invalid theory of recovery that might have been pled but was not and that, if pled, might have permitted the jury to find an improper unspecified element of damages.

I cannot agree with the majority's construction of either *Felton* or *Casteel.* I believe the majority's reading of *Felton* does great damage to the law by nullifying a very serious breach of the canons of ethics and standard of care of a reasonable and prudent physician as an act of malpractice for which damages may be recovered. I am also concerned that the majority's reading of *Casteel* allows an appellate court to overturn a jury verdict on damages entered in response to a broad-form theory of liability for medical negligence because the trial court did *not* submit to the jury a question or instruction on an invalid theory of liability that was *not pled* as a claim for damages by the plaintiff *or* as a defensive issue by the defendant, and as to which *no* damages were sought—but which the appellate court speculates nevertheless *might* have somehow been wrongly considered by the jury and *might* have led it wrongly to find invalid damages of an unspecified sort.

This highly speculative reading of applicable law stretches the scope of the informed consent statute beyond all recognition, distorts the well-established law of liability for both breach of the duty to disclose and medical negligence, and makes the entire law relating to the submission of broad-form jury questions unworkable, as the appellate court is allowed to speculate however it likes as to what the jury might have thought about unpled, unsubmitted, invalid causes of action and the unspecified damages that have been

awarded on those unpled causes of action, while it ignores the causes of action and defenses actually pled and the damages actually sought and awarded. The majority opinion sends the case back to be retried with an *evidentiary* instruction that the jury must not consider admissible material evidence of malpractice in assessing damages. The opinion can, therefore, only create confusion in the trial court on remand and in any subsequent trial court faced with any of the same issues.

In my view, the extraordinary circumstances of this case warrant en banc reconsideration. *See* TEX.R.APP. P. 41.2(c) (stating that en banc consideration is "not favored" and should only be ordered if "necessary to secure or maintain uniformity of the court's decisions" or "extraordinary circumstances require en banc consideration"). I therefore respectfully dissent from the denial of en banc reconsideration.

RUSSELL LLOYD, Justice, dissenting to denial of en banc reconsideration.

I respectfully dissent to the Court's denial of en banc reconsideration in this case.

The Texas Supreme Court has repeatedly reaffirmed its commitment to the submission of broad form questions, and has rejected attempts to expand the presumed harm analysis of *Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378 (Tex.2000), beyond those cases involving multiple theories of liability and multiple elements of damages. *See, e.g., Thota v. Young*, 366 S.W.3d 678, 688–89 (Tex.2012) (explaining *Casteel* and its progeny and refusing to extend presumed harm analysis to alleged combination of errors of submitting contributory negligence question and inferential rebuttal instruction). Even if the trial court erred in denying Dr. Benge's requested instruction (or a similar one limiting the jury's consideration of Williams's evidence about what Dr. Benge told her

regarding Dr. Giacobbe to assessing Dr. Benge's credibility for determining the ultimate issue in the case), such error would not automatically trigger a situation where we must presume the error was harmful. *See id.* at 693. As the court in *Thota* noted, "[i]f presumed harm analysis were required, then our fundamental commitment to submitting broad-form questions, whenever feasible, would routinely be discarded for separate granulated submissions." *Id.* This view is also consistent with the Texas Supreme Court's recognition that "in most cases where a trial court errs by refusing to give a proposed instruction the harm analysis will be based on whether the refusal probably caused the rendition of an improper judgment." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 865 (Tex.2009).

The complained-of evidence was an indispensable part of Williams's case and would have come in under any presentation of the case. Williams unequivocally stated that Dr. Benge's testimony that she had "g[iven him] consent to have Dr. Giacobbe participate in the surgery" was false, and accused Dr. Benge of being intentionally deceitful and unethical in violation of the American Medical Association's Code of Medical Ethics. In support of her negligence claim, Williams introduced evidence regarding Dr. Giacobbe's role in the surgery in order to attack Dr. Benge's credibility with regard to whether he acted unethically and deceptively. A jury's consideration of evidence of duty, breach, causation, and injury in determining a physician's liability for breach of the standard of professional care and damages for a professional negligence claim is not tantamount to consideration of commingled valid and invalid theories of liability. Submission of an invalid theory of liability involves a trial court's error in *affirmatively* instructing a jury to consider erroneous matters. *See Hawley*, 284

S.W.3d at 864–65; *see also Bed, Bath & Beyond, Inc. v. Urista,* 211 S.W.3d 753, 756 (Tex.2006) ("We specifically limited our holdings in *Casteel* and *Harris County* [*v. Smith,* 96 S.W.3d 230 (Tex.2002)] to *submission* of a broad-form question incorporating multiple theories of liability or multiple damage elements.") (emphasis added).

Because the panel majority's holding is incompatible with *Casteel, Hawley,* and *Thota,* I respectfully dissent to the denial of en banc reconsideration. *See* TEX. R.APP. P. 41.2(c) ("extraordinary circumstances require en banc consideration").